**MITA COPYSTAR AMERICA,**
Plaintiff–Appellant,

v.

**The UNITED STATES, Defendant–Appellee.**

No. 93–1466.

United States Court of Appeals, Federal Circuit.

April 11, 1994.

Steven P. Florsheim, Grunfeld, Desiderio, Libowitz & Silverman, New York City, argued for plaintiff-appellant.

John M. Peterson and Peter J. Allen, Neville, Peterson & Williams, New York City, were on the brief for amicus curiae, Xerox Corp.

Barbara M. Epstein, Commercial Litigation Branch, Dept. of Justice, New York City, argued for defendant-appellee. With her on the brief were Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office. Also on the brief was Stephen Berke, Office of the Asst. Chief Counsel, Intern. Trade Litigation, U.S. Customs Service, of counsel.

Before MICHEL, CLEVENGER and SCHALL, Circuit Judges.

MICHEL, Circuit Judge.

Mita Copystar America (Mita) appeals the May 20, 1993 decision of the United States Court of International Trade, No. 90–05–00260, slip op. 93–76, 1993 WL 179285, granting the government's motion for summary judgment and denying Mita's cross-motion for summary judgment. The court held that the United States Customs Service (Customs) properly classified Mita's toners and developers as "Chemical preparations" under the Harmonized Tariff Schedule of the United States (HTSUS), subheading 3707.90.30. Because no legal error has been shown, we affirm.

## BACKGROUND

Mita imports toners and developers for use in its own photocopy machines. These toners and developers are packaged in retail units and designed for use in a specific type or brand of machine such that they are not interchangeable. The toner consists of two different resins, carbon black (or, pigments, in the case of red or blue toners), dye, and silica and/or aluminum oxide. The developers consist of a "carrier" in the form of a combination of various metal oxides, and a small amount of toner. The subject toners and developers are manufactured through an involved process whereby the ingredients of each are mixed together in precise proportions, processed and later pulverized to form particles of the required size.

Mita's imported toners and developers are part of a "two component" system. When used in a photocopy machine, the developer is placed in the "developing unit" of the machine and the toner is placed in the "toner reservoir." During operation, toner is automatically fed into the developing unit, where it is continuously mixed with the developer in a predetermined ratio.

By contrast, a competing electrophotographic process, referred to as a "one component" system, utilizes a single multicomponent toner. In the one-component system, there is no mixing of toner with developer in the photocopy machine.

Customs classified the merchandise under HTSUS subheading 3707.90.30, encompassing "[c]hemical preparations for photographic uses," which carries a duty rate of 8.5 percent *ad valorem*. Mita claims that the proper classification is HTSUS subheading 3707.90.60, covering "[u]nmixed products for photographic uses, put up in measured portions or put up for retail sale in a form ready for use." Products in the latter category are assessed a duty rate of 1.5 percent *ad valorem*.[1] Mita filed timely protests with Customs, which were denied in December, 1989 and March, 1990. Mita then filed a complaint in the Court of International Trade. The parties filed cross-motions for summary judgment.

The trial court reviewed the Explanatory Notes to HTSUS section 3707.90,[2] which de-scribe two categories, "(A) single substance" versus "(B) preparation obtained by mixing or compounding together two or more substances." Slip op. at 10. Noting that this distinction mirrored the division between the two HTSUS subheadings, the court concluded that "unmixed products" in subheading 3707.90.60 refers to single substances as described in category (A), and "chemical preparations" in subheading 3707.90.30 corresponds to preparations of more than one substance as described in category (B). The court then referred to various lexicographic and scientific authorities to determine the common meaning of "substance." Based on its review of the materials, the court determined that the chemical dictionary definition of "substance" as "[a]ny chemical element or compound ... characterized by a unique and identical constitution and [ ] thus homogeneous," was most appropriate in this context. Slip op. at 13 (quoting *Hawley's Condensed Chemical Dictionary*, 1102 (11th ed. 1987)). The court therefore concluded that "products which [sic] are combinations of two or more elements or chemical compounds [such as

---

1. The disputed HTSUS heading states in full:
   3707 Chemical preparations for photographic uses (other than varnishes, glues, adhesives and similar preparations); unmixed products for photographic uses, put up in measured portions or put up for retail sale in a form ready for use:
   3707.10.00 Sensitizing emulsions....
   3707.90 Other:
   3707.90.30 Chemical preparations for photographic uses....
   3707.90.60 Unmixed products for photographic uses, put up in measured portions or put up for retail sale in a form ready for use.

2. The relevant portions of the explanatory notes to HTSUS section 3707 are as follows:
   3707.90 Other
   Subject to the conditions specified at (A) and (B) below, this heading covers products of a kind used directly in the production of photographic images. Such products include:
   * * * * * *
   (2) Developers to render latent photographic images visible (e.g., hydroquinone, catechol, pyrogallol, phenidone, p-N-methylaminophenolsulphate and their derivatives). The heading also includes developers used for electrostatic document reproduction.

* * * * *' *

(5) Toners to modify the colour of the image (e.g., sodium sulphide).

* * * * * *

All the products cited above fall within the heading only when they are:
(A) Single substances which are:
   (i) Put up in measured portions, that is uniformly divided up into the quantities in which they will be used, e.g., tablets, small envelopes put up containing the measured amount of powder for one developing bath; or
   (ii) In packings for retail sale and put up with any indication that they are ready for use in photography, whether by label, literature or otherwise (e.g., instructions for use, etc.).
   Single substances put up other than as above, are classified according to their nature (e.g., as chemical products in Chapter 28 or 29, as metallic powders in Section XV, etc.). or
(B) Preparations obtained by mixing or compounding together two or more substances for photographic use. Such preparations remain within the heading whether put up in bulk or small quantities, and whether or not presented for retail sale.

these toners and developers] are *chemical preparations,* and are correctly classified under HTSUS subheading 3707.90.30." Slip op. at 14 (emphasis added).

## ANALYSIS

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(5) (1988).

■ The Court of International Trade's grant of summary judgment is reviewed for correctness as a matter of law, and the ultimate question of the proper interpretation of a tariff term is also a question of law subject to *de novo* review. *Lynteq, Inc. v. United States,* 976 F.2d 693, 696 (Fed.Cir.1992).

■ Under 28 U.S.C. § 2639(a)(1) (1988), a classification of merchandise by Customs is presumed to be correct. Therefore, the burden of proof is upon the party challenging the classification. *Jarvis Clark Co. v. United States,* 733 F.2d 873, 876, 2 Fed.Cir. (T) 70, 72, *reh'g denied,* 739 F.2d 628, 2 Fed.Cir. (T) 97 (Fed.Cir.1984). When a tariff term is not defined in either the HTSUS or its legislative history, the term's correct meaning is its common meaning. *Lynteq,* 976 F.2d at 697. A court may rely upon its own understanding of terms used, and may consult standard lexicographic and scientific authorities, to determine the common meaning of a tariff term. *Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 789, 6 Fed.Cir. (T) 121, 125 (Fed.Cir.), *cert. denied,* 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988); *Trans–Atlantic Co. v. United States,* 471 F.2d 1397, 1398 (CCPA 1973). Additionally, a court may refer to the Explanatory Notes of a tariff subheading, which do not constitute controlling legislative history but nonetheless are intended to clarify the scope of HTSUS subheadings and to offer guidance in interpreting subheadings. *Lynteq,* 976 F.2d at 699.

■ On appeal, Mita argues that its toners and developers are unmixed products within the common meaning of the term, because they have their own identity in the trade as a single type of substance and they must be mixed together prior to use. Mita relies on *H. Reisman Corp. v. United States,* slip op. 93–227, 1993 WL 499804, 1993 Ct.Intl.Trade LEXIS 222 (December 1, 1993), involving the classification of an animal feed additive consisting of a mixture of two vitamin B–12 compounds, proteinaceous matter, water, and trace materials, which was occasionally mixed with ground corn cobs or rice hulls to facilitate its incorporation into animal feeds. Noting that the *Reisman* court stated that the additive was also sold in an "unmixed" form which would have to be mixed prior to its end use, *id.* 1993 WL 499804 at *1, at *4, Mita asserts that the common understanding of "unmixed products" therefore includes those products that must be mixed prior to their end use.

■ That Mita's products must be mixed together when used is irrelevant. It is well settled law that merchandise is classified according to its condition when imported. *United States v. Citroen,* 223 U.S. 407, 414–15, 32 S.Ct. 259, 259–60, 56 L.Ed. 486 (1911). If the rule were otherwise, not only could the same product be subject to different duty rates depending on its intended end use, but Customs would be flooded with affidavits or other evidence of differing intended uses. Moreover, Customs would have no way of determining whether the merchandise was actually used for its alleged intended purpose after importation. Mita's reliance on *Reisman* is unpersuasive because the meaning of the term "unmixed" was not at issue there. Nor is there anything in the instant tariff provision that suggests that it is proper to refer to mixing after importation for purposes of classifying merchandise. For both these reasons, we view this argument as unpersuasive.

■ Mita and amicus, Xerox Corporation, additionally argue that the trial court erred by unduly restricting the term "unmixed products" to include only elements and compounds. First, Mita relies on the common dictionary definition of "unmixed" as simply "not mixed." *Webster's Third New International Dictionary of the English Language,* Unabridged (1986), p. 2504. "Mixed," in turn, is defined as "combining the character-

istics of more than one kind or class: not conforming to a single type." *Id.* at 1448. Next, Mita notes that the Explanatory Notes do not define the meaning of the term "unmixed products," but merely indicate that the term is synonymous with a "single substance." *Webster's* defines "substance" in relevant part as:

b(1): a distinguishable kind of physical matter (2): a piece or mass of such substance ... c: matter of definite or known chemical composition: an identifiable chemical element, compound, or mixture— sometimes restricted to compounds and elements.

*Webster's* at 2279. Consequently, Mita argues that its toners and developers fit at least two of these common definitions of single substance because they consist of a "distinguishable kind of physical matter" and are "of definite or known chemical composition." Mita asserts that the trial court's reliance on the Condensed Chemical Dictionary definition of substance is overly technical and improperly restrictive because chemical lexicons may not come into play unless the involved provisions in the HTSUS are "chemical" provisions containing technical language.

It is undisputed that these toners and developers consist of a combination of elements and compounds. Nor can it be seriously disputed that the merchandise in question is of a technical chemical nature. The tariff provision at issue here is directed to "Chemical preparations." Additionally, the Explanatory Notes to section 3707 define developers and toners by their chemical composition, not simply by their function. Therefore, the intended audience of this tariff provision presumably includes importers and retailers who are familiar with photographic chemicals, not the general public at large. Moreover, we note that the chemical dictionary definition and the more general definition contained in *Webster's* are in close agreement. Like the chemical dictionary, *Webster's* also defines "substance," at least in the chemical context, as sometimes limited to "an element or compound." Consequently, we conclude that the trial court did not err in referring to a chemical dictionary and preferring it over a general dictionary.

Nonetheless, Mita argues by reference to other chapters of the HTSUS, that "unmixed products" as used in Chapter 37 can include chemical mixtures such as these toners and developers. First, Mita notes that Chapters 28 and 29, referred to in the Explanatory Notes to HTSUS 3707, clearly include chemical mixtures. Second, Mita refers to a statement in Explanatory Note 2(a) of HTSUS Chapter 30, which expressly defines "unmixed products" for purposes of subheadings 3003 and 3004 as, *inter alia:* "(2) All goods of Chapter 28 or 29; and (3) Simple vegetable extracts of heading No. 13.-02, merely standardized or dissolved in any solvent." By definition, "unmixed products" under these subheadings include chemical mixtures. Mita argues that "where the same word or phrase is used in different parts of the same statute, it will be presumed, in the absence of any clear indication of a contrary intent, to be used in the same sense throughout the statute," relying on *Productol Chemical Co. v. United States,* 74 Cust.Ct. 138, 151, C.D. 4598 (1975) (citing *Schooler v. United States,* 231 F.2d 560, 563 (8th Cir.1956), and *Acme Venetian Blind & Window Shade Corp. v. United States,* 56 Cust.Ct. 563, 568, C.D. 2704 (1966)). Therefore, Mita asserts, "unmixed products" as used in 3707.90.60 should also be construed to include chemical mixtures.

The fact that Chapters 28 and 29 include chemical mixtures as well as elements and compounds does not establish that "single substance" or "unmixed product" as used in Chapter 37 must also include chemical mixtures. Similarly, Explanatory Note 2(a) is limited in both purpose and coverage of only two subheadings, 3003 and 3004, in Chapter 30. Thus, inclusion of chemical mixtures under the category of unmixed products in Chapter 30 is clearly the exception, not the rule. There is no like statutory definition or exception in subheading 3707.90.60 that suggests that 3707.90.60 should be interpreted to include chemical mixtures. Moreover, if Congress had intended to create a similar exception to HTSUS 3707.90.60, it easily could have done so and would be expected to do so in the same manner. It did not. We

therefore decline to define this subheading to include chemical mixtures.

 Finally, Mita argues that it is aware of no elements and only one compound (*i.e.*, acetic acid) "put up in measured portions" or packaged for retail sale which are commonly used for photographic or electrophotographic purposes that would fit within the trial court's definition of "unmixed product" under HTSUS 3707.90.60. Therefore, Mita asserts, it could not have been the intent of Congress to establish an entire tariff category encompassing only one compound.

By reference to the examples of developers listed in the Explanatory Notes, however, the government has established that at least one other such compound falls within this definition of "unmixed product"—hydroquinone. Therefore, the point about congressional intent fails. Although the "unmixed products" category as defined by Customs and the trial court may be small or limited, we conclude that Mita has not established that this definition is absurd or legally incorrect.

### CONCLUSION

Customs is an expert agency and its classifications are statutorily presumed to be correct. Therefore, absent a showing of legal error in the construction of a tariff term, we, like the trial court, should uphold a Customs' classification decision. Here, appellant does not challenge the correctness of the classification decision, only the legal construction of the tariff term. We hold there is no legal error. Therefore, the decision of the Court of International Trade is

*AFFIRMED.*