**Slip Op. 01-32**

# United States Court of International Trade

| |
|---|
| ARTHUR L. FRANKLIN d/b/a HEALTH TECHNOLOGIES NETWORK,<br><br>        Plaintiff,<br><br>     v.<br><br>UNITED STATES,<br><br>        Defendant. |

BEFORE: Pogue, Judge

Court No. 99-05-00283

[Plaintiff's motion for summary judgment denied. Defendant's motion for summary judgment granted. Judgment entered for Defendant.]

Decided: March 28, 2001

<u>Vandeventer Black LLP</u> (<u>Mark T. Coberly</u>), for Plaintiff.

<u>Stuart E. Shiffer</u>, Acting Assistant Attorney General, <u>Joseph I. Liebman</u>, Attorney in Charge, International Trade Field Office, <u>Aimee Lee</u>, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; <u>Beth C. Brotman</u>, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs Service, Of Counsel, for Defendant.

## OPINION

**Pogue, Judge**: Plaintiff, Arthur L. Franklin d/b/a/ Health Technologies Network ("Arthur Franklin"), challenges a decision of the United States Customs Service ("Customs") denying Arthur Franklin's protests filed in accordance with section 514 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1514 (1994). At issue is the proper tariff classification under 19 U.S.C. § 1202, Harmonized Tariff Schedule of the United States ("HTSUS"), of Arthur Franklin's imports of coral sand packets marketed under the

names "Ericssons Alka-Mine Coral Calcium" and "Alka-Line Coral Calcium," and identified as, respectively, "GRANULES OF NATURAL CORAL, Additive for Healthy Water," see Def.'s Ex. D, and "NATURAL MINERAL FOOD SUPPLEMENT, Additive for Healthy Water," see Def.'s Ex. J.

Arthur Franklin claims that the subject merchandise is classifiable under subheading 8421.21.00, HTSUS, covering "Filtering or purifying machinery and apparatus for liquids: For filtering or purifying water." Goods classifiable under subheading 8421.21.00 were subject to duty rates of 3.1% (1995), 2.3% (1996) and 1.6% (1997), ad valorem, for the years in which the subject merchandise was entered at the port of Norfolk, Virginia. Alternatively, Arthur Franklin claims classification under subheading 0508.00.00, HTSUS, as "Coral and similar materials, unworked or simply prepared but not otherwise worked . . . ." Goods classifiable under 0508.00.00 were allowed to be entered duty free from 1995 to 1997.[1]

Customs classified the merchandise under a residual or "basket" provision, subheading 2106.90.99, HTSUS, covering "Food preparations not elsewhere specified or included: Other . . . ." Goods classifiable under subheading 2106.90.99 were subject to duty

---

[1]In the Complaint, Arthur Franklin also maintained that classification is proper under subheading 2509.00.20, HTSUS, as "Chalk: Other," which carried a rate of duty of 1.1% (1995), 0.8% (1996), and 0.6% (1997). See Complaint at ¶ 20. In a subsequent filing, however, Arthur Franklin conceded that the merchandise is not properly classifiable under this subheading. See Pl.'s Mem. Opp. Def.'s Mot. Summ. J. ("Pl.'s Mem.") at 13.

rates of 9.4% (1995), 8.8% (1996) and 8.2% (1997), ad valorem. Arthur Franklin protested Customs' classification and, in response, Customs issued Headquarters Ruling 962059 (Oct. 21, 1998).  Arthur Franklin asks the Court to overturn Customs' Ruling and classify its merchandise under subheading 8421.21.00, or, in the alternative, subheading 0508.00.00.

## Standard of Review

Jurisdiction is predicated on 28 U.S.C. § 1581(a); therefore, Customs' classification is subject to de novo review pursuant to 28 U.S.C. § 2640.  Following the Federal Circuit's holding in Mead Corp. v. United States, 185 F.3d 1304, 1306-07 (Fed. Cir. 1999), cert. granted, 120 S.Ct. 2193 (2000), the Court does not afford the deference articulated in Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43 (1984), to Customs' standard classification rulings.  Moreover, although there is a statutory presumption of correctness that attaches to Customs' classification decisions, see 28 U.S.C. § 2639(a)(1), that presumption is not relevant where the Court is presented with a question of law in a proper motion for summary judgment, see Universal Elecs. v. United States, 112 F.3d 488, 492 (Fed. Cir. 1997).

This action is before the Court on summary judgment motions made by Arthur Franklin and Defendant, the United States, pursuant to USCIT Rule 56.  Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." USCIT R. 56(c). A dispute is genuine "if the evidence is such that [the trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1985).

The court resolves any doubt over material factual issues in favor of the nonmoving party, and draws all reasonable inferences in its favor. See Anderson, 477 U.S. at 255; Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). Nevertheless, "[w]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." USCIT R. 56(e).

Here, the parties agree that the imported merchandise is coral sand, to which a small amount of L-ascorbic acid has been added, and which has been packaged in one gram fiber bags. See Pl.'s Stmt. Undisputed Material Facts and Addition to Def.'s Stmt. Undisputed Material Facts at ("Pl.'s Stmt.") ¶¶ 2-4; Def.'s Stmt. Undisputed Material Facts ("Def.'s Stmt.") at ¶¶ 2-4; Def.'s Resp. Pl.'s Stmt. ("Def.'s Resp. Stmt.") at ¶ 4. Moreover, the parties agree that the effect of the merchandise is to increase the hardness and alkalinity of water, as well as to reduce bacteria and chlorine present in water.[2] See Pl.'s Stmt. at ¶¶ 7-11; Def.'s

_____

[2]Summary judgment of a classification issue is appropriate "when there is no genuine dispute as to the underlying factual

Stmt. at ¶¶ 7-11; Def.'s Resp. Stmt. at ¶¶ 7-11.  Although the parties disagree as to the "principal use" of the merchandise, see Pl.'s Mem. at 12, Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 5, Pl.'s Reply Mem. Supp. Pl.'s Mot. Summ. J. ("Pl.'s Reply") at 5, Arthur Franklin has failed to set forth specific facts showing that this is a genuine issue for trial.  See discussion infra Part I.  Summary judgment is therefore appropriate.

The Court's analysis of a Customs classification issue proceeds in two steps: "first, [it] construe[s] the relevant classification headings; and second, [it] determine[s] under which of the properly construed tariff terms the merchandise at issue falls."  Bausch & Lomb, 148 F.3d at 1365 (citing Universal Electronics, 112 F.3d at 491).  While the first step is a question of law and the second step is a question of fact, see Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998), whether the imported merchandise is properly classified is ultimately a question of law.  See Bausch & Lomb, 148 F. 3d at 1365.

### The Parties' Positions

Arthur Franklin argues that the imported merchandise is an apparatus for filtering or purifying liquids, and therefore classifiable under subheading 8421.21.00.  See Pl.'s Mem. at 8-12.

---

issue of exactly what the merchandise is."  Bausch & Lomb v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998).

Upon placing the merchandise in a specified amount of water, the calcium carbonate in the coral increases the hardness (i.e., the amount of calcium carbonate), and thereby raises the alkalinity (i.e., the pH level) of the water. See id. at 9. The increase in alkalinity has the effect of killing bacteria present in the water. See id. Further, L-ascorbic acid, which is added to the coral sand, reacts with and neutralizes chlorine in the water. See id. at 2. Alternatively, Arthur Franklin claims that the addition of L-ascorbic acid does not take the merchandise outside of subheading 0508.00.00, which covers "unworked" or "simply prepared" coral. See id. at 12-13.

The United States responds that the merchandise adds rather than removes elements from water; as such, the merchandise does not function as a device for filtering or purifying for classification purposes. See Def.'s Mem. at 5. In any event, argues the United States, "the primary purpose of the imported substance is to increase the mineral content (hardness) and alkalinity (pH) of water through the addition of elements, and not to purify water." Id. Furthermore, the United States asserts that the merchandise is not classifiable under subheading 0508.00.00 because of the addition of L-ascorbic acid, and because the Chapter Notes preclude classification under chapter 0508 of goods that are ingested. See id. at 5-6. From its contention that the merchandise is similar to other products classified under subheading 2160.90.00, the United States concludes that Customs' classification of the merchandise as "other" food preparations under the basket provision of subheading

2106.90.99 was correct.  See id. at 4-5.


### Discussion

Orlando Foods requires us first "to determine whether the product at issue is classifiable under the heading."[3]  Orlando Foods, 140 F.3d at 1440.  If the merchandise is classifiable under more than one heading, "The heading which provides the most specific description shall be preferred to headings providing a more general description."  GRI 3(a), HTSUS; see also Orlando Foods, 140 F.3d at 1440.  The precise issue before the Court, then, is whether the subject merchandise is properly classified under any of the headings suggested by the parties.  Because we find that the merchandise is classifiable under only one of the suggested headings, there is no relative specificity issue.

---

[3]General Rule of Interpretation ("GRI") 1 for the HTSUS provides that, "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes . . . ."  GRI 1, HTSUS.  See also Harmonized Commodity Description and Coding System, Explanatory Notes (2nd ed. 1996)("Explanatory Notes"), at GR 1(V) ("[T]he terms of the headings and any relative Section or Chapter Notes are paramount, i.e., they are the first consideration in determining classification.").

The Explanatory Notes "provide a commentary on the scope of each heading of the Harmonized [Tariff] System and are thus useful in ascertaining the classification of merchandise under the system."  H.R. Conf. Rep. No. 100-576, at 549 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1582.  It has long been settled that, "[w]hile the Explanatory Notes do not constitute controlling legislative history, they do offer guidance in interpreting HTS[US] subheadings."  Lonza, Inc. v. United States, 46 F.3d 1098, 1109 (Fed. Cir. 1995).

## I.   Whether the subject merchandise is a filtering or purifying device

This court has previously construed the tariff terms "filter" and "purify."  In <u>Noss Co. v. United States</u>, 7 CIT 111, 588 F. Supp. 1408 (1984), <u>aff'd</u> 753 F.2d 1052 (Fed. Cir. 1985), the court cited several lexicographic definitions of "purify" in analyzing heading 661, TSUS, which was replaced without any relevant change by heading 8421 in the HTSUS:

> [T]o make pure: as to clear from material defilement or imperfection; free from impurities or noxious matter * * *.  <u>Webster's Third New International Dictionary</u> (1981).
> To free from admixture with foreign or vitiating elements; make clear or pure * * *.  <u>Funk & Wagnalls New Standard Dictionary of the English Language</u> (1941)
> [T]o remove unwanted constituents from a substance. <u>McGraw-Hill Dictionary of Scientific and Technical Terms</u> (2d ed. 1978).

<u>Noss</u>, 7 CIT at 115-16, 588 F. Supp. at 1412.  The court noted that "purify" and "filter" may be used synonymously.  <u>Id.</u> at 116, n.4, 588 F. Supp. at 1412, n.4.  In <u>Deringer v. United States</u>, 10 CIT 798, 800, 656 F. Supp. 670, 671-72 (1986), <u>aff'd</u> 832 F.2d 592 (Fed. Cir. 1987), the court adopted the <u>Noss</u> court's definitions, and we follow suit here.

Given this construal of the terms "filter" and "purify," the merchandise purifies insofar as the addition of hardness[4] raises

---

[4]Of course, "hardness" is itself considered an impurity in water; the Explanatory Notes to heading 8421 provide specifically for water softeners.  <u>See</u> Explanatory Notes at 84.21(II)(A) ("Filtering and purifying machinery, etc., for liquids, including water softeners.").  This notwithstanding, Arthur Franklin asserts that the merchandise is similar to the chemical water purifiers provided for in the Explanatory Notes, which include permutite or zeolite softeners.  <u>See</u> Pl.'s Mem. at 5-7, 9-10;

the alkalinity level of water, and thereby reduces bacteria, and insofar as the L-ascorbic acid neutralizes chlorine. Bacteria and chlorine are recognized as impurities when present in  water.  See HQ 953683 (Apr. 5, 1993)(classifying water treatment units under heading 8421, in part, because the units inhibit bacteria growth and remove chlorine odor in water); see also 19 McGraw Hill Encyclopedia of Science and Technology 387 (8th ed. 1997)(defining "water treatment" as "[p]hysical and chemical processes for making water suitable for human consumption and other purposes.  Drinking water must be bacteriologically safe, free from toxic or harmful chemical [sic] or substances, and comparatively free of turbidity, color, and taste-producing substances.").[5]

---

Explanatory Notes at 84.21(II)(A)(8).  Even if the merchandise works by chemical reaction, however, "chemical water purifiers," just as all other kinds of purifiers, must be chiefly used to purify to be classifiable under heading 8421.  The subject merchandise is not chiefly used to purify.  See discussion infra.

[5]Arthur Franklin points out that heading 8421 has been construed to include devices that "treat" water.  See Pl.'s Mem. at 5-8, 10-11.  The term "treatment," however, has been used in a way consistent with the definitions of "purify" and "filter" given above.  See NY 889108 (Sept. 2, 1993)(classifying water treatment units under 8421.21.00 because "[t]he systems are based on treating water with ozone to remove impurities and deionize it").  In some of these rulings, "treatment" has been used to describe a process that neither adds nor removes elements from the water, yet effectively deals with an impurity in the water. See NY A84906 (June 28, 1996)(classifying water treatment unit that used magnets to control hard water deposits under subheading 8421.21.00); NY 894074 (Feb. 7, 1994)(same).  Thus, while Arthur Franklin may urge a broader interpretation of the terms "purify" and "filter" than that forwarded by the United States, which focuses on the physical removal of impure elements, Arthur Franklin may not argue that use of the word "treatment" expands the scope of the heading beyond its terms, which specify devices that "filter" or "purify."  See GRI 1.

Insofar as the addition of hardness raises the alkalinity level of water, and thereby benefits the health of the consumer in ways other than those associated with the reduction of bacteria, however, the merchandise does not purify or filter in the sense required under heading 8421. Rather, the merchandise has more than one use, in that it partly serves to purify water and partly serves to make water otherwise "healthier" for the consumer. Arthur Franklin's marketing materials emphasize that water of a higher alkalinity may bring health benefits to the user, because the human diet generally tends to produce a sub-optimal acidity level in the body. See Def.'s Ex. E (claiming, for example, that "[c]oral calcium turns water alkaline for healthy pH balance in the body"). Notwithstanding these claims, there is no evidence to indicate that the pH level of "good" water[6] is an "imperfection," or in any other way an "unwanted constituent" of the water itself, in the same way that bacteria or chlorine is.

Heading 8421 is a "use" provision, which, under the HTSUS, means "principal use." See Deringer, 10 CIT at 801, 656 F. Supp. at 672; Pharmacia Fine Chemicals, Inc. v. United States, 9 CIT 438, 439 (1985)(citing Noss, 7 CIT at 116, 588 F. Supp. at 1412); see also Additional U.S. Rule of Interpretation 1(a) ("[A] tariff classification controlled by use . . . is to be determined in accordance with the use in the United States at, or immediately

---

[6]Since the instructions specify "good" water, and suggest the use of bottled or distilled water, this merchandise is apparently not designed to remedy overly acidic water. See Def.'s Ex. J.

prior to, the date of importation . . . and the controlling use is the principal use.").  In short, the merchandise must be "chiefly used" to filter or purify in order to be classified under heading 8421.  Pharmacia, 9 CIT at 439.  Plaintiff has provided no evidence from which an inference could be drawn that the chief use of the subject merchandise is to purify.

In this case, the marketing materials presented as exhibits to the record, and cited extensively by both parties, defy Arthur Franklin's bald assertion that the chief use of the merchandise is to purify.[7]  See Pl.'s Mem. at 5; Pl.'s Reply at 5.  Rather, the marketing materials place primary emphasis on the ability of the merchandise to benefit the general health of the consumer in ways unrelated to the specific ability of the merchandise to purify.[8]  See, e.g., Def.'s Ex. E (emphasizing positive effects of merchandise on longevity and general health, claiming "Never has a natural product done more for your health!"; the headline on page 2 of the exhibit reads "Attention Your Health is at Stake!");

---

[7]"It is well established in customs law that although descriptions contained in service manuals and marketing literature 'are not conclusive, they are relevant evidence of industry usage, particularly when they contradict the plaintiff's present position in [the] litigation.'" Lloyds Elecs., Inc. v. United States, 15 CIT 164, 168 (1991)(citing NEC America, Inc. v. United States, 8 CIT 184, 190, 596 F. Supp. 466, 471 (1984), aff'd, 760 F.2d 1295 (Fed. Cir. 1985))(brackets in original).

[8]Arthur Franklin argues that "the health benefits claimed are only the benefits one gets from drinking purified water in which acidity and chlorine have been reduced."  Pl.'s Reply at 4. Drinking purified water does contribute to good health, but, as explained above, "reducing acidity" is not purification for classification purposes.

Def.'s Ex. J (label on packaging indicates product is a "Natural Mineral Food Supplement:  Additive For Healthy Water").

The marketing materials do use the words "purify" and "filter" in various forms.  The descriptions of the merchandise's ability to "filter" and "purify" are, however, vague, and in any event do not comport with Arthur Franklin's argument in this litigation that the merchandise "purifies" because it reduces the presence of bacteria. See Pl.'s Reply at 1-2.  In one piece of marketing literature, called "The Coral Calcium Story," the merchandise is alleged to have a "unique purification quality" and to "allow[] spontaneous filtration of the liquid," yet nowhere is the reduction of bacteria discussed.[9]  Def.'s Ex. E.  In a second piece of marketing literature, it is maintained that "a filtering and purifying process . . . assists the body in developing and maintaining a proper pH balance."  Id.  It is, however, the increase in alkalinity per se, not the killing of bacteria resulting from the increase in alkalinity, that would affect the body's pH level.[10]

---

[9]Interestingly, the only reference to bacteria is in the material describing Alka-Line Coral Calcium Gold, merchandise not at issue here, which "contains minute traces of silver bonded to the coral granules helping to eliminate bad bacteria."  Def.'s Ex. E.

[10]It is also asserted that the merchandise "purif[ies] the water just as it does [sic] in cleaning up the toxins from the ocean," and later that, "[t]he purified liquid becomes a proper environment for the body to process nutrients and dispose of toxins, free radicals and other waste products."  See Def.'s Ex. E.  To the extent this suggests that the merchandise purifies by removing toxins other than bacteria and chlorine from the water, such a claim is simply not supported by the laboratory reports stipulated to by the parties.  See Def.'s Ex. G, H.  To the extent that it is suggested that the "purified" water helps the

The marketing materials do make plain that one purpose of the merchandise is to reduce chlorine in water.  Id.   And, as noted above, the merchandise in fact purifies in that it kills bacteria. This evidence notwithstanding, Arthur Franklin has failed to set forth specific facts showing that the principal use of the merchandise is a genuine issue for trial.   Plaintiff lays no factual basis from which we could draw a reasonable inference in opposition to the conclusion that the principal use of the imported merchandise is to function as a health supplement, rather than as a water purifier, as that term is understood for classification purposes.  The emphasis given in the marketing materials to general health claims negates Arthur Franklin's claim in litigation that the merchandise is chiefly used to purify.   Consequently, the merchandise is not properly classifiable under heading 8421.

## II. Whether the subject merchandise is "unworked" or "simply prepared" coral

Arthur Franklin claims that the merchandise may alternatively be classified under heading 0508, which covers "Coral and similar materials, unworked or simply prepared but not otherwise worked . . . ."  The Explanatory Notes indicate that "unworked" coral is coral "from which only the outer crust has been removed." Explanatory Notes at 05.08(1).  "Simply prepared" coral is coral "not having undergone processes extending beyond simple cutting."

_____

body flush out toxins, these claims have to do with general health rather than with effect of the merchandise on the water.

Id. at 05.08(2).

It appears from the record that the merchandise is mined as sand, rather than mined as pieces of coral that are later ground into sand.[11]  See Pl.'s Interrogatory Answers 6(a)(b); Pl.'s Mem. at 1.  Assuming it is mined as sand, we agree with the United States that the addition of L-ascorbic acid takes the subject merchandise outside the scope of "simply prepared" coral.[12]  In Headquarters Ruling 223538, the "calcium sand" was found to be "simply prepared" because the preparation process involved only grading and treatment with chemicals to kill bacteria present on the coral and shells.  See HQ 223538 (Oct. 1, 1992).  Rather than merely eliminating impurities present on the coral, the L-ascorbic acid adds an additional feature to the finished product, insofar as the merchandise functions to remove chlorine from water -- a function not performed by coral sand acting alone.  The "simple cutting" proposed by the Explanatory Notes as the limit of what may

---

[11]The record is somewhat unclear on this point.  In its memorandum, the merchandise is described as "ground (dead) coral, commonly referred to as coral sand."  Pl.'s Mem. at 1. In Interrogatory Answer 6(a)(b), which describes the production process of the merchandise, Arthur Franklin refers only to "coral."  See Pl.'s Interrogatory Answer 6(a)(b).  There is, however, no reference in 6(a)(b) to any industrial grinding process.  See id.  The United States notes that "the product here is of a powder consistency, suggesting more processing of the original coral," Def.'s Opp. Pl.'s Cross-Mot. Summ. J. at 16; such additional processing, however, cannot be confirmed on this record.  The lack of clarity on this factual point does not preclude summary judgment because, as the analysis will show, heading 0508 does not apply in any case.

[12]The merchandise cannot be considered "unworked" because some degree of processing or preparation is admitted.  See Pl.'s Interrogatory Answer 6(a)(b).

be considered "simply prepared" coral would not, under any common sense view, stretch to include a process that augments the natural capabilities of the coral.

Assuming, on the other hand, that the merchandise is mined as pieces of coral that are subsequently ground into sand using an industrial process, the merchandise could not be called "simply prepared." "Simple cutting" has been used to refer to wire cut to size for use in a particular application, see Samsonite Corp. v. United States, 12 CIT 1146, 1148, 702 F. Supp. 908, 910 (1988), aff'd 889 F.2d 1074 (Fed. Cir. 1989)(citing General Instrument Corp. v. United States, 462 F.2d 1156 (CCPA 1972)). Grinding of the coral would clearly entail more processing than mere cutting to size, or than the "grading" referred to in Headquarters Ruling 223538 that separated out a certain size of particle for use as "calcium sand," but involved no cutting or grinding. See HQ 223538 (Oct. 1, 1992); see also 6 Oxford English Dictionary 846 (2d ed. 1989)(defining "grind" as, "[t]o reduce to small particles or powder by crushing * * * "); 4 Oxford English Dictionary 172 (defining "cut" as, "[t]o divide into two or more parts * * * "). Thus, under either factual scenario, the merchandise is not classifiable under heading 0508.

**III. Whether Customs correctly classified the subject merchandise under heading 2106 as "other" food preparations**

The tariff term "preparation" was construed in Nestle Refrigerated Food Co. v. United States, 18 CIT 661 (1994):

The term "preparation" has been defined as "something

> that is prepared: something made, equipped, or compounded for a specific purpose * * *." Webster's Third New International Dictionary 1790 (unabridged 1993) . . . . The Oxford English Dictionary defines "preparation" as a "substance specially prepared, or made up for its appropriate use or application, e.g. as food or medicine * * *." 12 Oxford English Dictionary 374 (1989). And in United States v. P. John Hanrahan, Inc., 45 CCPA 120, C.A.D. 684 (1958), the court elaborated upon what constitutes a "preparation" in its analysis of the tariff term "edible preparation." The Hanrahan court stated that "where the imported merchandise is a distinct and recognized article of commerce, having an individual name, and which is produced from a raw material by a definite series of steps, said merchandise is a preparation." Id. at 122.

Nestle Refrigerated Food, 18 CIT at 673-74.

The subject merchandise falls squarely within the definition of "preparation." The raw material of coral sand is processed by a definite series of steps, including washing, drying, treating with L-ascorbic acid, and packaging in one gram fiber bags; further, the merchandise is specifically made to treat drinking water. See Pl.'s Interrogatory Answers 6(a)(b); Pl.'s St. at ¶ 6; Def.'s St. at ¶ 6. Moreover, because the merchandise adds to and affects the properties of water that is ultimately consumed, it may properly be considered a "food preparation." See 6 Oxford English Dictionary 8 ("food" is that which "is taken into the system to maintain life and growth, and to supply the waste of tissue * * * "). Finally, Explanatory Note 21.06(A) makes clear that the heading covers all "[p]reparations for use, either directly or after processing (such as cooking, dissolving or boiling in water, milk, etc.), for human consumption." Explanatory Notes at 21.06(A). In this case, water is consumed after the merchandise is

allowed to steep in the water, a process that is similar to the
dissolving process specified in the Explanatory Note. Thus, both
the terms of the heading and the Explanatory Notes support our
conclusion that the merchandise is classifiable under heading
2106.[13]

_____

[13]As further support for its argument that classification
under heading 2106 is proper, the United States points to
Explanatory Note 21.06(14). This Explanatory Note provides for
the inclusion of:

> Products consisting of a mixture of plants or parts of
> plants . . . which are not consumed as such, but which
> are of a kind used for making herbal infusions or herbal
> "teas" . . . including products which are claimed to
> offer relief from ailments or contribute to general
> health and well-being.

Explanatory Notes at 21.06(14). The United States asserts that,
"Like a tea or infusion, the imported substance is placed in
water which results in the addition of certain elements that are
then consumed when the water is drunk." Def.'s Mem. at 7.
We agree that Explanatory Note 21.06(14) may be viewed as
supportive of classification under heading 2106, despite the fact
that coral is not a plant, but an animal. See 3 The New
Encyclopedia Britannica (Micropaedia) 618 (15th ed. 1986)(coral
is "any of a variety of invertebrate marine organisms of the
class Anthozoa (phylum Cnidaria)"). The term "infusion" is not
limited to plant products, and describes the use of the
merchandise at issue. The Oxford English Dictionary defines
"infusion" as, "The process of pouring water over a substance, or
steeping the substance in water, in order to impregnate the
liquid with its properties or virtues." 7 Oxford English
Dictionary 953. It defines "infuse" as, "To steep or drench (a
plant, etc.) in a liquid, so as to extract its soluble properties
* * * To affect or act upon (a liquid) by steeping some soluble
substance in it * * * ." Id.
Here, it is undisputed that the coral sand is somewhat
soluble, with the result that, upon steeping for a specified
amount of time, hardness and alkalinity are added to the water.
See Pl.'s Stmt. at ¶¶ 8-10; Def.'s Stmt. at ¶¶ 8-10; Def.'s Ex.
F, G. Moreover, to the extent that the L-ascorbic acid added to
the coral sand removes or reduces chlorine in the water, the
merchandise may be said to "affect or act upon" the water in this
way as well. See Pl.'s Stmt. at ¶ 11; Def.'s Stmt. at ¶ 11;
Def.'s Ex. H. Thus, the merchandise is accurately described as

Within heading 2106, Customs classified the merchandise under subheading 2106.90.99, a "basket" provision covering "Food preparations not elsewhere specified or included: Other . . . .". Classification in a basket provision is only appropriate if there is no subheading within the heading that covers the merchandise more specifically. See EM Indus. v. United States, 22 CIT ___, __, 999 F. Supp. 1473, 1480 (1998)("'Basket' or residual provisions of HTSUS Headings . . . are intended as a broad catch-all to encompass the classification of articles for which there is no more specifically applicable subheading."). A survey of the subheadings of heading 2106 reveals that there is no other subheading that is more specific; other subheadings, for example, cover protein concentrates, dried dairy products, butter substitutes, certain kinds of syrups, and fruit or vegetable juices. Therefore, "[a]bsent a more apt subheading," we conclude that Customs correctly classified the subject merchandise under subheading 2106.90.99. Orlando Foods, 140 F.3d at 1442.

---

an "infusion." Explanatory Note 21.06(14) may also support classification under heading 2106 because, as detailed above, the merchandise claims to contribute to general health. See discussion infra Part I.

## **Conclusion**

For the foregoing reasons, the Court holds that Customs correctly classified Arthur Franklin's imported merchandise under subheading 2106.90.99, HTSUS.  Accordingly, Arthur Franklin's motion for summary judgment is denied.  In turn, the United States' motion for summary judgment is granted and judgment is entered for the United States.

_____

Donald C. Pogue
Judge

Dated:     March 28, 2001
           New York, New York