Arthur L. **FRANKLIN** (doing business as Health Technologies Network), Plaintiff–Appellant,

v.

**UNITED STATES, Defendant–Appellee.**

No. 01–1340.

United States Court of Appeals, Federal Circuit.

April 26, 2002.

Mark T. Coberly, Vanderventer Black LLP, of Norfolk, VA, argued for plaintiff-appellant.

Arthur J. Gribbin, Attorney, International Trade Field Office, Department of Justice, of New York, NY, argued for defendant-appellee. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Commercial Litigation Branch, Department of Justice, of Washington, DC; and Joseph I. Liebman, former Attorney in Charge, International Trade Field Office; and Aimee Lee, Attorney, Civil Division, Commercial Litigation Branch, Department of Justice, of New York, NY. Of counsel on the brief was Beth C. Brotman, Attorney, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs Service, of New York, NY. Of counsel was John J. Mahon, International Trade Field Office.

Before LOURIE, GAJARSA, and PROST, Circuit Judges.

PROST, Circuit Judge.

Arthur L. Franklin d/b/a Health Technologies Network ("Franklin") appeals from the decision of the United States Court of International Trade denying Franklin's motion for summary judgment and granting the government's cross-motion for summary judgment that the United States Customs Service ("Customs") properly classified Franklin's imported coral sand packets under subheading 2106.90.99 of the Harmonized Tariff Schedule of the United States, 19 U.S.C. § 1202 ("HTSUS"). *Franklin v. United States*, 135 F.Supp.2d 1336 (Ct. Int'l Trade 2001). We conclude that the imported goods are properly classified under subheading 8421.21.00 of the HTSUS and therefore reverse.

## BACKGROUND

The imported goods at issue in this case are coral sand packets that were imported by Franklin in 1995, 1996, and 1997. *Franklin*, 135 F.Supp.2d at 1337. This coral sand, otherwise known as coral calcium, is mined from fossilized coral reefs in Okinawa, Japan. After harvesting, the coral is washed, dried, treated with L-ascorbic acid, and packaged in one-gram fiber bags. *Id.* at 1344. When the consumer places one of these fiber bags in a specified amount of water, the coral adds calcium and magnesium ions to the water. This increases the water's pH, rendering it more alkaline or "hardening" it. *Id.* at 1339. The alkaline environment produced by this process kills bacteria in the water. *Id.* Additionally, the L-ascorbic acid reacts with and neutralizes chlorine in the water. *Id.* Less than 5% of the product goes into solution, and the majority of the coral sand is not ingested with the water but instead remains in the fiber bag at the bottom of the glass.

Customs classified the coral sand under subheading 2106.90.99 of the HTSUS, *id.* at 1338, which is a residual, or "basket," provision of heading 2106 that covers "[f]ood preparations not elsewhere specified or included ... [o]ther," HTSUS, sub-

heading 2106.90.99.[1] Imports classifiable under this subheading were dutiable at a rate of 9.4% (1995), 8.8% (1996), and 8.2% (1997) *ad valorem. Franklin*, 135 F.Supp.2d at 1338. Franklin protested this classification and subsequently challenged it in the Court of International Trade. *Id.* According to Appellant, its coral packets were properly classifiable under subheading 8421.21.00 of the HTSUS, *id.* at 1337, which covers:

8421 Centrifuges, including centrifugal dryers; filtering or purifying machinery and apparatus, for liquids or gasses; parts thereof:

8421.21 Filtering or purifying machinery and apparatus for liquids:

8421.21.00 For filtering or purifying water

HTSUS, heading 8421. Goods classified under subheading 8421.21.00 were subject to duty rates of 3.1% (1995), 2.3% (1996), and 1.6% (1997) *ad valorem. Franklin*, 135 F.Supp.2d at 1337.[2]

Both parties moved for summary judgment. *Id.* at 1338. The Court of International Trade denied Franklin's motion and granted the government's corresponding cross-motion, holding that Customs had correctly classified Appellant's imported goods as a "[f]ood preparatio[n] ... [o]ther" under subheading 2106.90.99. *Id.* at 1345.

As a preliminary matter, the court concluded that Franklin's coral sand was not a filtering or purifying device within the meaning of heading 8421. *Id.* at 1341. The court based this conclusion upon its finding that the coral sand had two distinct uses: (1) reduction of bacteria and neutralization of chlorine in the water, *id.* at 1340–41; and (2) addition of "hardness," or water alkalinity, which, according to Franklin's marketing materials, made the water healthier, *id.* at 1341.[3] According to the court, the first use qualified as purification or filtration under 8421, but the second did not. As the court stated, "[i]nsofar as the addition of hardness raises the alkalinity level of water, and thereby benefits the health of the consumers in ways other than those associated with the reduction of bacteria, ... the merchandise does not purify or filter in the sense required under heading 8421." *Id.* The court noted that because 8421 is a "use" provision, Franklin's coral sand must have been "chiefly used" to filter or purify in order to fall under the heading. *Id.* After examining Appellant's marketing materials, the court determined that Franklin had failed to provide any evidence from which one could infer that the coral sand's chief use was to purify. *Id.* As such, the court

1. Specifically, subheading 2106.90.99 covers "[p]reparations for the manufacture of beverages: (71) Containing high-intensity sweeteners (e.g., aspartame and/or saccharin); (72) Containing sugar derived from sugar cane and/or sugar beets; (73) Other; (75) Nondairy coffee whiteners; (80) Other cream or milk substitutes; (85) Confectionary (including gum) containing synthetic sweetening agents (e.g., saccharin instead of sugar); (87) Herbal teas and herbal infusions comprising mixed herbs; (88) Flavored honey; (90) Other: Canned; (95) Other: Frozen; (97) Other: Containing sugar derived from sugar cane and/or sugar beets; (98) Other...." HTSUS, subheading 2106.90.99.

2. On appeal, Franklin abandons its alternative claim for classification as "[c]oral and similar materials, unworked or simply prepared but not otherwise worked" under heading 0508, HTSUS.

3. As the court noted, "Arthur Franklin's marketing materials emphasize that water of a higher alkalinity may bring health benefits to the user, because the human diet generally tends to produce a sub-optimal acidity level in the body." *Id.* at 1341.

concluded that the coral sand was not properly classifiable under subheading 8421.21.00.

The court further analyzed the coral sand under heading 2106. It concluded that because the sand was added to and affected the properties of water that was ultimately ingested, it qualified as a food preparation. *Id.* at 1344. The court found that the coral sand steeped in the water in a manner similar to the dissolving process described in Explanatory Note 21.06(A) and therefore fell within the heading. *Id.* The court also based its holding upon its finding that Franklin's coral qualified as an "infusion" within the meaning of Explanatory Note 21.06(14). *Id.* at 1344 n. 13. Within heading 2106, the court found that the coral sand was properly classified under subheading 2106.90.99 because no other subheading covered Appellant's goods more specifically. *Id.* at 1345. Because the court found that the subject merchandise was classifiable under only one of the suggested headings, it concluded that the case presented no relative specificity issue under General Rule of Interpretation ("GRI") 3. *Id.* at 1340.

Franklin timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

### DISCUSSION

■ We review the Court of International Trade's grant of summary judgment without deference. *Mead Corp. v. United States,* 283 F.3d 1342, 1345 (Fed.Cir. Mar. 8, 2002). The proper scope and meaning of a tariff classification term is a question of law to be reviewed *de novo, Rollerblade, Inc. v. United States,* 112 F.3d 481, 483 (Fed.Cir.1997), while determining whether the goods at issue fall within a particular tariff term as properly construed is a question of fact, *N. Am. Processing Co. v. United States,* 236 F.3d 695, 697 (Fed.Cir.

2001). We afford Customs' classification rulings deference in accordance with the principles set forth in *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *United States v. Mead Corp.,* 533 U.S. 218, 234–35, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *Mead,* 283 F.3d at 1346. Under *Skidmore,* a classification decision receives a measure of deference proportional to its power to persuade. *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161. Despite this deference, however, the court continues to "recogniz[e] its independent responsibility to decide the legal issue regarding the proper meaning and scope of the HTSUS terms." *Mead,* 283 F.3d at 1346 (citing *Rocknel Fastener, Inc. v. United States,* 267 F.3d 1354, 1358 (Fed. Cir.2001)).

■ The GRIs of the HTSUS and the Additional United States Rules of Interpretation guide the court's classification of goods imported into the United States. *JVC Co. of Am. v. United States,* 234 F.3d 1348, 1352 (Fed.Cir.2000). According to GRI 1, "classification shall be determined according to the terms of the headings and any relevant section or chapter notes...." *Franklin,* 135 F.Supp.2d at 1340 n. 3. "Only after determining that a product is classifiable under the heading should the court look to the subheadings to find the correct classification for the merchandise." *Orlando Food Corp. v. United States,* 140 F.3d 1437, 1440 (Fed.Cir.1998). Under GRI 3(a), when goods are *prima facie* classifiable under two or more headings, the merchandise should be classified under the heading that provides the most specific description.

■ Absent legislative intent to the contrary, we construe HTSUS terms according to their common and commercial meanings, which are presumed to be the same. *N. Am. Processing,* 236 F.3d at

698. In construing a tariff term's common meaning, the court may rely on its own understanding of the term as well as upon lexicographic and scientific authorities. *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed.Cir.1994). The court may also refer to the Explanatory Notes accompanying a tariff subheading. *Id.* Although these notes do not constitute controlling legislative history, they are nonetheless intended to clarify the scope of the HTSUS subheadings and to offer guidance in their interpretation. *Id.*

## A

### SUBHEADING 8421.21.00

■ Franklin argues that the Court of International Trade erred when it concluded that Customs properly classified its coral sand under subheading 2106.90.99. Appellant asserts that its coral sand purifies within the meaning of heading 8421 because it removes unwanted constituents from water and therefore falls under the definition of "purify" set forth in *Noss Co. v. United States*, 588 F.Supp. 1408 (Ct. Int'l Trade 1984), *aff'd*, 753 F.2d 1052 (Fed.Cir.1985), and *Deringer v. United States*, 656 F.Supp. 670 (Ct. Int'l Trade 1986), *aff'd*, 832 F.2d 592 (Fed.Cir.1987). According to Franklin, these unwanted constituents are chlorine, bacteria, and softness. Finally, Franklin asserts that its coral sand works in precisely the same manner as a zeolite water softener, which is specifically covered by the Explanatory Notes accompanying subheading 8421.21. Franklin asserts that because its coral functions according to the same chemical principals as zeolite softeners, the sand should fall within the same tariff subheading.

The government responds that the Court of International Trade correctly affirmed Customs' classification of Franklin's coral under 2106.90.99. The government argues that Appellant's goods do not purify or filter within the meaning of heading 8421 because the coral sand's principal use is to raise the alkalinity of water, thereby making it harder and allegedly healthier for consumers. According to the government, the coral sand's antibacterial and chlorine-neutralizing effects are incidental to this principal use. The government distinguishes Franklin's merchandise from a zeolite water softener on the ground that while the specific purpose of a water softener is to remove hardness from water, the intended effect of Appellant's coral sand is to add hardness and alkalinity.

We agree with Franklin that its goods are properly classified under subheading 8421.21.00. In *Noss*, the Court of International Trade relied on several lexicographic sources to construe the tariff term "purify"[4] to mean "to make pure: as to clear from material defilement or imperfection; free from impurities or noxious matter.... To free from admixture with foreign or vitiating elements; make clear or pure.... *[T]o remove unwanted constituents from a substance.*" 588 F.Supp. at 1412 (emphasis added) (internal citations omitted).

■ Under *Noss*, an imported good purifies if it removes *unwanted constituents* from a substance, regardless of what those unwanted constituents may be. The relative "purity" of the constituents themselves is immaterial. In *Deringer*, 656 F.Supp. at 671, for example, the Court of International Trade addressed the question of whether reverse osmosis maple sap concentrators qualified as filtering and pu-

---

**4.** The court noted that "filter" and "purify" could be used synonymously, 588 F.Supp. at 1413 n. 4, but held that a device need not both purify and filter in order to fall within the tariff classification, *id.* at 1412.

rifying machinery under heading 661, TSUS.[5] Appellant Deringer argued that they did not because, rather than removing an impurity in "the classical sense," the machines removed water, thereby concentrating the remaining sugar, minerals, and bacteria and resulting in an increasingly "impure" product. *Id.* Relying on *Noss,* the court rejected this argument, concluding that Deringer's goods purified within the meaning of the tariff term because they freed the sap from "extraneous matter," namely excess water. *Id.* at 672. As the court observed, "[w]hile excess water may not be an impurity in 'the classical sense,' it is clear from testimony that it is an 'unwanted constituent' in the raw maple sap used in making maple syrup." *Id.* As such, the court held that the concentrators purified within the meaning of the tariff classification. *Id.*

Franklin's coral sand functions exclusively to remove unwanted chlorine, bacteria, and acidity from water. Its principal use is therefore to purify within the meaning of subheading 8421.21.00. In holding otherwise, the Court of International Trade relied on a false distinction between the sand's use in eliminating chlorine and bacteria and in altering the water's pH. The court rejected Franklin's filtration/purification argument on the ground that "there is no evidence to indicate that the pH level of 'good' water is an 'imperfection,' or in any other way an 'unwanted constituent' of the water itself, *in the same way that bacteria or chlorine is.*" *Franklin v. United States,* 135 F.Supp.2d 1336, 1341 (Ct. Int'l Trade 2001) (emphasis added). For purposes of heading 8421, however, the relevant inquiry is not whether the subject merchandise removes inherently unsalutary "imperfections" such as bacteria or chlorine. Instead, as in *Noss* and *Deringer,* the question is whether the

goods at issue remove unwanted extraneous matter. *Noss,* 588 F.Supp. at 1412; *Deringer,* 656 F.Supp. at 672. While decisions of the Court of International Trade are not binding precedent on this court, *Nat'l Corn Growers Ass'n v. Baker,* 840 F.2d 1547, 1556 (Fed.Cir.1988), we find the rationale set forth in these two cases persuasive. Because the principal use of Franklin's coral sand is to eliminate unwanted properties from water, it is properly classified under subheading 8421.21.00. Additionally, we note that the Court of International Trade relied in part on the marketing material's lack of emphasis on purifying and its reference to the healthful benefits of an increase in the body's pH level. We consider that these materials are not decisive either way, as they refer both to health and purification.

We further note that the coral sand uses a similar exchange of ions as that employed by a zeolite water softener, only in reverse. Zeolites act chemically to remove calcium and magnesium ions from hard water by adding sodium ions; Appellant's coral replaces hydrogen ions with calcium and magnesium ions, thereby rendering softer water "harder" or less acidic. In other words, both zeolites and Franklin's coral adjust the pH of water by a process of ionic exchange. As discussed above, zeolite water softeners are specifically covered by the Explanatory Notes accompanying subheading 8421.21. "While Explanatory Notes do not constitute controlling legislative history, they do offer guidance in interpreting HTS[US] subheadings." *Lonza, Inc. v. United States,* 46 F.3d 1098, 1109 (Fed.Cir.1995). Here, we find that the coral sand's similarity to a zeolite water softener further supports our finding that the sand is properly classified under subheading 8421.21.00.

5. Heading 661, TSUS was replaced without relevant change by heading 8421, HTSUS.

## B
### SUBHEADING 2106.90.99

Franklin argues that its coral sand was not properly classifiable as a food preparation under heading 2106 and that the Court of International Trade therefore erred in affirming Customs' classification. Appellant asserts that its product is not food because it is not taken into the system and does not supply nutrients to support life and growth. Instead, Appellant argues, the majority of the coral remains at the bottom of the glass while a small percentage goes into solution in order to change the chemical content of the water. Franklin relies heavily upon *Strauss v. United States,* 43 Cust.Ct. 136 (1959). According to Appellant, *Strauss* stands for the proposition that imported merchandise is not a food preparation if the consumer does not eat the entire product; ingesting a few of the goods' constituent elements is not enough.

The government responds that Appellant's merchandise is edible because it is specifically used to treat drinking water and because the elements imparted by the product are ultimately ingested by the consumer. According to the government, the Court of International Trade correctly found that the coral sand imparts hardness and alkalinity to the water in a manner similar to the dissolving process specified in the Explanatory Notes at 21.06(A). Therefore, the government argues, the court correctly affirmed the sand's classification under subheading 2106.90.99. Finally, the government distinguishes *Strauss* on the ground that unlike the bubble gum at issue in that case, the consumer is intended to ingest the hardness and alkalinity added to water treated with Appellant's coral sand.

 As a preliminary matter, we note that GRI 3(a) is instructive. Even assuming *arguendo* that Customs was correct when it found that Franklin's coral sand was *prima facie* classifiable as a "[f]ood preparatio[n] not elsewhere specified or included" under heading 2106, heading 8421 provides a more specific description of the subject merchandise. Consequently, Appellant's coral is properly classified under that heading in general and under subheading 8421.21.00 in particular. GRI 3(a); *Orlando Food Corp. v. United States,* 140 F.3d 1437, 1441 (Fed.Cir.1998) ("[W]hen a product is prima facie classifiable under two or more headings, '[t]he heading which provides the most specific description shall be preferred to headings providing a more general description.' ") (quoting GRI 3(a)).

We further agree with Franklin, however, that the coral sand is not a food preparation at all within the meaning of heading 2106. In *Strauss,* 43 Cust.Ct. at 141, the United States Customs Court held that bubble gum was not "an edible preparation" under the Tariff Act. Before the court, the government argued that the tariff classification should be construed to cover gum because the product contained sugar and dextrose syrup which were swallowed as the gum was chewed. *Id.* at 140. According to the government, bubble gum's status as food depended upon whether its component parts were edible. The court rejected this argument. As the court stated:

> The common meaning to be applied is that of the imported preparation, not of its several components. While the sugars and syrup in the preparation "bubble gum" are nutritious when swallowed, and in that sense they (the sugars and syrup) are edible, there is not such evidence as to the preparation "bubble gum." To the contrary, it appears that bubble gum is not customarily eaten and swallowed.

*Id.* at 140. Similarly, nothing in the instant record indicates that one would eat one of Franklin's one-gram bags of coral sand. Even if the goods' component parts, namely calcium carbonate or, as the government argues, alkalinity, are ingested, this is not enough to bring Franklin's product within heading 2106. Although *Strauss* is not binding precedent on this court, we find its rationale persuasive.

Of course, the analysis cannot end here, because one typically would not eat a bag of tea, either. As discussed above, the Court of International Trade relied heavily upon Explanatory Note 21.06(14), which provides for the inclusion within heading 2106 of "[p]roducts consisting of a mixture of plants or parts of plants ... which are not consumed as such, but which are of a kind used for making herbal infusions or herbals 'teas'...." *Franklin v. United States*, 135 F.Supp.2d 1336, 1344 n. 13 (Ct. Int'l Trade 2001). The court found that although Appellant's coral is not a plant but an animal, it was accurately described as an "infusion." *Id.* It based this conclusion on its finding that like tea, one "steep[ed]" the coral sand in water, *id.* at 1344, and thereby "impregnat[ed] the liquid with its properties," specifically hardness, alkalinity, and the chlorine-neutralizing effects of the L-ascorbic acid, *id.* at 1344 n. 13 (quoting 7 Oxford English Dictionary 953).

This finding misconstrues the processes that occur when Franklin's coral sand is placed in water. Unlike tea, the subject merchandise is not consumed as a food. It purifies the water. Moreover, the purification heading 8421.21.00 is more specific than the food preparation heading 2106.90.99. Accordingly, we find that the subject merchandise is not correctly classified as a "[f]ood preparatio[n] ... other" within the meaning of subheading 2106.90.99.

## CONCLUSION

Although we are mindful of Customs' expertise and that of the Court of International Trade in classifying imported articles, for the reasons stated above, we conclude that Franklin's coral sand is not a food preparation. The classification ruling at issue here lacks the power to persuade under the principles set forth in *Skidmore*. Because the imported articles are correctly classified under subheading 8421.21.00, the decision of the Court of International Trade is reversed.

*REVERSED.*