UNITED STATES *v.* JOHN B. STETSON Co. (No. 3567) [1]

[1] T. D. 46319.

4

United States Court of Customs and Patent Appeals, April 12, 1933

*Charles D. Lawrence*, Assistant Attorney General (*Hugo P. Geisler*, special attorney, of counsel), for the United States.

*Allen S. Olmstead, 2d, Saul, Ewing, Remick & Saul* for appellee.

[Oral argument February 7, 1933, by Mr. Lawrence and Mr. Olmstead, 2d]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The appellee made two entries of imported leather at the port of Philadelphia under the Tariff Act of 1930. This leather was classified by the collector for duty as grained sheepskin leather under paragraph 1530 (d) of said act. The importer filed protest, covering both entries, making various claims therein; however, at the hearing before the United States Customs Court, all said claims were abandoned except the claim that the goods were properly dutiable under paragraph 1530 (c) of said act as "finished" leather. The protest was sustained by the trial court under said paragraph 1530 (c), and the Government has appealed.

Inasmuch as further reference to various provisions of said paragraph 1530 will be made herein, the entire paragraph is here quoted:

PAR. 1530. (a) Hides and skins of cattle of the bovine species (except hides and skins of the India water buffalo imported to be used in the manufacture of rawhide articles), raw or uncured, or dried, salted, or pickled, 10 per centum ad valorem.

(b) Leather (except leather provided for in subparagraph (d) of this paragraph), made from hides or skins of cattle of the bovine species:

(1) Sole or belting leather (including offal), rough, partly finished, finished, curried, or cut or wholly or partly manufactured into outer or inner soles, blocks, strips, counters, taps, box toes, or any forms or shapes suitable for conversion into boots, shoes, footwear, or belting, 12½ per centum ad valorem;

(2) leather welting, 12½ per centum ad valorem;

(3) leather to be used in the manufacture of harness or saddlery, 12½ per centum ad valorem;

(4) side upper leather (including grains and splits), patent leather, and leather made from calf or kip skins, rough, partly finished, or finished, or cut or wholly or partly manufactured into uppers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear, 15 per centum ad valorem;

(5) upholstery, collar, bag, case, glove, garment, or strap leather, in the rough, in the white, crust, or russet, partly finished, or finished, 20 per centum ad valorem;

(6) leather to be used in the manufacture of footballs, basket balls, soccer balls, or medicine balls, 20 per centum ad valorem;

(7) all other, rough, partly finished, finished, or curried, not specially provided for, 15 per centum ad valorem.

(c) Leather (except leather provided for in subparagraph (d) of this paragraph), made from hides or skins of animals (including fish, reptiles, and birds, but not including cattle of the bovine species), in the rough, in the white, crust, or russet, partly finished, or finished, 25 per centum ad valorem; vegetable-tanned rough leather made from goat or sheep skins (including those commercially known as India-tanned goat or sheep skins), 10 per centum ad valorem; any of the foregoing if imported to be used in the manufacture of boots, shoes, or footwear, or cut or wholly or partly manufactured into uppers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear, 10 per centum ad valorem.

(d) Leather of all kinds, grained, printed, embossed, ornamented, or decorated in any manner or to any extent (including leather finished in gold, silver, aluminum, or like effects), or by any other process (in addition to tanning) made into fancy leather, and any of the foregoing cut or wholly or partly manufactured into uppers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear, all the foregoing by whatever name known, and to whatever use applied, 30 per centum ad valorem.

(e) Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for, 20 per centum ad valorem; boots, shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing, whether or not the soles are composed of leather, wood, or other materials, 35 per centum ad valorem.

(f) Harness valued at more than $70 per set, single harness valued at more than $40, saddles valued at more than $40 each, saddlery, and parts (except metal parts) for any of the foregoing, 35 per centum ad valorem; saddles made wholly or in part of pigskin or imitation pigskin, 35 per centum ad valorem; saddles and harness, not specially provided for, parts thereof, except metal parts, and leather shoes laces, finished or unfinished, 15 per centum ad valorem.

(g) The Secretary of the Treasury shall prescribe methods and regulations for carrying out the provisions of this paragraph.

Said paragraph is, in substance, a consolidation of paragraphs 1431, 1436, 1589, 1606, and 1607 of the Tariff Act of 1922, with

additional and altered provisions and is, apparently, intended to be a comprehensive and analytical classification of bovine hides and of leather, leather footwear, and harness and saddlery.

The main controversy in the case centers about one point: The importer contends the imported leather is *"grain"* leather, finished, and is included within the classification made by said paragraph 1530 (c). The Government contends that the imported leather is *grained*, and hence is specifically mentioned in, and classifiable under, said paragraph 1530 (d). As an ancillary question, the importer claims that any leather, to be properly classifiable under said paragraph 1530 (d), must, by the terms of said subparagraph, be *fancy*; that the imported leather is not known, commonly or commercially, as "fancy" leather, and that, therefore, the imported leather can not properly be classified under said subparagraph 1530 (d). Considerable testimony has been offered on both sides in an attempt to throw light upon these issues.

The trial court found that the importer had established by a preponderance of the evidence that the imported leathers "were not known, either commonly or commercially, as fancy leathers." It also held, in speaking of the term "grained leather":

There is no question here of a commercial meaning for the term different from the common meaning since the witnesses disagree as to whether there exists such a commercial meaning.

It also held that—

in grouping grained leather with leather printed, embossed, ornamented, or decorated, it was the intent of Congress that only leather artificially grained was designed to be classified thereunder.

On the trial two samples were introduced, which are also before us. From these it appears that the leather is of two kinds, one represented by Exhibit 1, and the other by Exhibit 2. Both samples are admitted to be finished sheepskin leather and are russet in color, with a polished and attractive appearance. Exhibit 1, which is small in size and is said to have come from the flank or poorer portion of the skin has its finished surface covered in large part with wavy, broken, lines. Exhibit 2, which comes from the better portion of the hide, has its finished side covered with a vast number of small, raised portions, giving the surface a granular or pebbly appearance.

The two kinds of leather are subjected to a somewhat different method of preparation. After the hair has been removed and the skin is ready for tanning, if leather like Exhibit 1 is desired, the skins are tanned in a weak solution of sumac extracts or leaf sumacs, at the room temperature. After tanning, the skins are colored the desired color and are then treated with a board by a workman, a process which is called *boarding*. This is done by folding each hide with the

wool side in. A workman wearing a board with a cork surface on his forearm then passes this board over the outside of the folded hide, much as if he were ironing the same. This process "brings out," accentuates, and raises the natural grain of the skin. In the case of the leathers represented by Exhibit 1 the boarding is done in one direction only by the workman.

In Exhibit 2 the leather is tanned in a strong solution at elevated temperatures. This results in a puckering and drawing of the hide, which is said to accentuate the natural grain. These hides are likewise colored and are then boarded in four different directions instead of in one, as in Exhibit 1.

We are unable to agree with the view of counsel for the appellee in their construction of the language of said paragraph 1530 (d). Here we find an enumeration of several kinds of leather which are to be classified thereunder, and these are designated *eo nomine:* Grained leather, printed leather, embossed leather, ornamented leather, and decorated leather. If the involved leather be of any one of these varieties it is within the subparagraph, because the Congress has so specifically provided. Nor can we agree with the view that the language "or by any other process (in addition to tanning) made into fancy leather," removes "grained" leather from the subparagraph, unless it be also known as "fancy." The use of the language "or by any other process (in addition to tanning)" indicates plainly, in our view of the matter, that the Congress, having enumerated what it considered to be fancy leather, was providing a general clause which would make it possible to include therein any leathers made fancy, by any other process than those already enumerated. To hold otherwise would be to make it possible to remove any leather, such as "embossed," for example, from the purview of the subparagraph by proof that it was not commercially or commonly known as "fancy" leather.

"Or by any other process," in its ordinary grammatical construction as a part of the sentence in which it is found, obviously refers to any other process than graining, printing, embossing, ornamenting, or decorating, as there are no other antecedents to which the phrase may grammatically refer.

In other words, the Congress has by this subparagraph named "grained" leather as one variety of fancy leather for tariff purposes.

This view is at variance with the circular letter of the Commissioner of Customs issued August 21, 1930, T. D. 44213, 58 Treas. Dec. 160, cited by counsel for appellee herein. The commissioner was of the opinion that no leather might be included within said paragraph 1530 (d) unless it was known "in the trade" as "fancy leather," which, as we read it, means its commercial designation as such. This view, he states—

finds support in the conference report on the tariff bill, dated June 13, 1930, on page 98 of which appears this language: "The House bill also imposed a duty of 30 per cent ad valorem on fancy leather of all kinds." (Cong. Rec., 71st Cong., 2d sess., vol. 72, p. 10729.)

This argument loses its force if, as we have seen, grained leather has been recognized by Congress as one form of fancy leather.

The court below held, as we have noted, that a "clear preponderance" of the evidence established that the leathers involved here were not known, either commonly or commercially, as fancy leather. As we view it this is immaterial, for if the leathers were "grained" they were "fancy" within the meaning of subparagraph 1530 (d).

This being our construction of the language of said paragraph 1530 (d), we next inquire whether the leather now before us is "grained" leather as contended by the Government, or "grain" and not "grained" leather as contended by the appellee.

The trial court was of the opinion that there could be no commercial designation, because the witnesses differed, saying—

there is no question here of a commercial meaning for the term different from the common meaning since the witnesses disagree as to whether there exists such a commercial meaning. *Maddock v. Magone*, 152 U. S. 368; *Swan v. Arthur*, 103 U. S. 597; *Acker v. United States*, 1 Ct. Cust. Appls. 328, T. D. 31431; and *United States v. Walter*, 4 Ct. Cust. Appls. 95, T. D. 33371.

The mere fact that there is a conflict of evidence upon the commercial designation of the articles in question here is not a sufficient circumstance in itself to lead to the conclusion that there has been no commercial designation established. That question must be determined according to the preponderance of the evidence. *United States v. Borgfeldt*, 1 Ct. Cust. Appls. 255, T. D. 31279; *Meyer & Lange et al. v. United States*, 3 Ct. Cust. Appls. 247, 250, T. D. 32565; *United States v. Snow's Express Co.*, 6 Ct. Cust. Appls. 477, T. D. 36120; *La Manna, Azema & Farnan v. United States*, 14 Ct. Cust. Appls. 289, T. D. 41908; *French Kreme Co. et al. v. United States*, 16 Ct. Cust. Appls. 126, T. D. 42768; *French Kreme Co. v. United States*, 18 C. C. P. A. (Customs) 301, T. D. 44505.

We assume, however, that the meaning of the trial court in the said excerpt from its decision was that, because of the conflict in the evience, it was unable to find a preponderance thereof establishing commercial designation of the imported goods differing from their common designation.

The record before us, therefore, may properly be examined as to proof of common and commercial designations of the imported merchandise. The judgment of the trial court will be sustained, as to all triable issues of fact, unless clearly contrary to the weight of the evidence.

On the trial in the Customs Court the importer called three witnesses, and the Government a like number. We have examined the

testimony of these witnesses and are unable to find any evidence on either side which may be said to establish a commercial designation of the imported leather, on the one subject which we deem to be material, namely, whether the leather in question is or is not *grained* leather. A considerable amount of testimony was offered on the question of whether the goods were commercially known as *fancy* leather. Without analyzing or attempting to pass upon the sufficiency of such testimony to establish such commercial designation, it is sufficient to observe that, in consonance with our herein-expressed views as to the construction to be placed upon said paragraph 1530 (d), the material question is not whether the goods may commercially be known as fancy leather, but, rather, whether they are known commercially as grained leather. The same is true as to proof of common meaning.

No commercial designation having been established, we may next inquire as to the state of the law and the record on the question of the common designation of the imported goods. The common meaning to be attached to a term or word used by the Congress in a provision of a tariff act is a matter to be determined by the court having the same under consideration. In making this determination the court may rely upon its own understanding of the word or term used, and it may assist its own understanding by reference to the works of standard lexicographers, scientific authorities, the testimony of witnesses, or by such other means as may be available. If testimony be offered upon the common meaning of a statutory word or term such testimony is advisory only and has no binding effect on the court. *United States* v. *Flory & Co.*, 15 Ct. Cust. Appls. 156. T. D. 42219; *United States* v. *Felsenthal*, 16 Ct. Cust. Appls. 15, T. D. 42713; *United States* v. *May Department Stores*, 16 Ct. Cust. Appls. 353, T. D. 43090; *United States* v. *Moscini*, 19 C. C. P. A. (Customs) 144, T. D. 45261. This is true whether the court be *nisi prius* or appellate.

A brief résumé of the testimony of the witnesses is necessary.

E. L. Cummings, connected with the importing company, testified that the imported leather is "grain," and not "grained," leather.

Harry C. Drueding, a leather manufacturer for 26 years, stated that the leather in question is finished grain leather and that "grained" leather is made with electrotype plates. By this method a plate with a surface made to simulate the pattern or type of leather to be manufactured is placed face up, and the leather laid flesh side down upon the plate. By pressure the design upon the plate is then transferred to the hair side of the leather being treated. The witness further stated that there is a natural grain to all leather and that the effect of boarding is to "cut up that puckered effect in the skin." He also stated:

X Q. Well, hasn't it been improved?—A. Naturally, because if you did not manipulate those skins and board those skins you wouldn't see the natural grain,

This witness also testified that he considered "grained" and "embossed" leather "as one and the same."

John C. McKeon, a shoe manufacturer for over 25 years, testified that grain leather is leather tanned on the grain side. In speaking of the official Exhibits 1 and 2, the witness stated, "I would say the natural grain has been roughened."

On the part of the Government George B. Bernheim, a manufacturer of leather for 29 years, stated that a grained leather was one on which a grain had been made by hand boarding. Again he testified:

The grain may be a natural grain, and that may be brought out by hand boarding or machine. They have now some machines which take the place of hand boarding, or the grain may have first been embossed and then grained up by hand or by machine.

Continuing, he stated that Exhibit 2 is known as a pebble grain and is termed a grained skin; that the grain "would have never been brought out to look like that unless some subsequent operation had been put on the skin." Boarding, the witness stated, was the same as graining, and any leather boarded by hand is known as grained leather. A dictionary of leather terms, issued by the Joint Committee of Tanners and Leather Goods Industries, November 1, 1927, was introduced in evidence without objection in connection with the testimony of this witness, which dictionary, it appears, is used generally in the trade.

Milton Kaufman, in the leather business throughout the United States for 40 years, defined grained leather as leather in which the top grain has been artificially "improved upon," either by embossing or by hand boarding. The witness was of opinion that official Exhibit 1 was not grained and that Exhibit 2 was.

Moe H. Garfinkel, in the leather business for 24 years, testified that grained leather was leather in which the grain "is brought up to the surface or raised by either hand graining or machine." Exhibit 2, he stated, is a hand-grained pin sheep; Exhibit 1 is a smooth leather.

From this testimony two facts are shown: First, the imported leather has been hand boarded, that represented by Exhibit 1 once, and that represented by Exhibit 2 four times; second, this operation of boarding cuts up, accentuates, and pulls out the natural grain of the skin, and if such operation were not performed the natural grain of the skin would not be noticeable.

There is some conflict in the testimony as to the boarding of Exhibit 1. However, the appellee's witness Drueding testified that Exhibit 1 had been boarded, and this is conceded by counsel for appellee in their brief.

We are forced to the conclusion that but little assistance is given to either the Customs Court or to this court by the conflicting testimony given below in determining the common meaning of the term

"grained leather." Such testimony does, however, disclose the character and structure of the imported material. With this knowledge the court below and this court should aid their understanding by reference to those authorities which are usually referred to when the common meaning of a word or term is involved.

The words "grained" and "grain" are thus defined by the standard lexicographers:

Funk & Wagnalls' New Standard Dictionary (1931):

Grain * * * 3. In leather-making: (1) To rub with a board to raise the grain or pattern. (2) To give wrinkles or other markings to, in imitation of seal, * * * and similar leathers.

Graining * * * (3) by roughening the surface, as the artificial markings on leather; or (4) by the pebbling of leather or paper, as in bookbinding.

Graining-machine, n 1. A device for wrinkling or raising the grain on a skin.

Webster's New International Dictionary (1932):

Grained. 2. Having a grain; divided into small particles or grains; having or showing a grain or granulated structure or surface; hence, rough.

Encyclopædia Britannica, 14th edition, volume 13, page 850:

The box or willow grain is produced either by hand or machine. The skin is doubled, grain side inside, and then pressure is applied to the doubled portion in the required directions either by hand with a cork covered board or by rotating cork covered rollers, so as to make the natural grain take a defined form. Skins of this type are often finally smoothed by placing the grain surface of the skins in pressure contact with a polished plate.

New English Dictionary, Volume IV, page 341:

Grain. v. 6. Leather-dressing. a. To remove the hair from (skins). b. To soften or raise the grain of (leather, etc.).

1530. Palsgr. 574/1, I grayne ledder, I make it by tannyng crafte to have a grayne, je besanne.

"Boarding" is thus defined:

Webster's, *supra*:

Board. v. 7. To work or rub with a board, as in the process of making leather supple and giving it a granular appearance by means of a graining board.

Funk & Wagnalls', *supra*:

Boarding, * * * b-machine, *n*. A machine for raising the grain of leather after it has been lost by shaving, dyeing, etc.

In discussing the finishing of leather, Procter, in his treatise on The Principles of Leather Manufacture, 1903, page 233, says:

* * * For many purposes, and especially if a grain is afterwards to be raised by "boarding" the curried leather, this graining in the paddle is not disadvantageous, so long as it is not excessive.

The Dictionary of Leather Terminology, *supra*, gives the following definitions:

(108) Boarded leathers. Sides or skins finished by folding with grain side in and rubbing the surface together under pressure of an instrument known as a handboard. Machinery is now also used. The effect is sometimes imitated by embossing. Also called "box" or "willow" finish.

(117) Embossed leathers. Finished by stamping designs on hides or skins with etched, engraved, or electrotyped plates or rollers. Used extensively on fancy pocketbook leather, upholstery and bag leathers and splits, and sometimes on shoe-upper leather. These designs may be an imitation of the natural or conventionalized grain of skins of different animals as well as of an artificial nature.

A consideration of these authorities, in view of the evidence, leads the mind to the conclusion that the imported leathers have been "grained" within the common meaning of that word. The operation of "boarding" was to produce a surface finish upon the leather which would otherwise not have been there.

Two of importer's witnesses stated that all grained leather was made with electrotype plates. If this be true there seems to be no reason for the use of both of the words "embossed" and "grained" in paragraph 1530 (d), for graining, in that case, would only be a method of embossing.

The word "grained" is, therefore, one having a well-defined common meaning, and there is no legislative history shown, or ambiguity suggested, which would require us to adopt any other than the common meaning for the said word.

Counsel for appellee have cited several authorities which we have examined. Each of the cases cited was decided upon a statute differing from that now in question, and the constructions made in those cases are deemed inapplicable here.

We therefore conclude that there was error in the judgment of the Customs Court and that the protest of appellee should have been overruled.

The judgment of the United States Customs Court is *reversed*.