Slip Op. 01-99

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  RICHARD K. EATON, JUDGE

―――――――――――――――――――――――――

|  |  |  |
|---|---|---|
| **DMV USA, INC.,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Court No. 99-06-00370** |
| | : | |
| **UNITED STATES,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

―――――――――――――――――――――――――

Plaintiff moved for summary judgment in action contesting United States Customs Service's ("Customs") classification of its modified whey product Esprion 250.  Plaintiff claimed:  (1) merchandise was "whey protein concentrate" within meaning of the Harmonized Tariff Schedule of the United States ("HTSUS") subheading 0404.10.05, as common meaning of term did not specify minimum protein level; and (2) in the event that the merchandise was not "whey protein concentrate," certain entries should be accorded quota-class priority and status and, thus, receive lower tariff rate, as entry summaries covering merchandise had been properly submitted prior to quota's closure.  The United States ("Government"), on behalf of Customs, cross-moved for summary judgment, claiming that subject merchandise was properly classified under HTSUS subheading 0404.10.15.  Government claimed:  (1) common meaning of "whey protein concentrate" mandated 25% minimum protein content level; and (2) Plaintiff's documents were not submitted "in proper form" and, thus, merchandise was not eligible for lower rate of duty.  The United States Court of International Trade, Eaton, J., held:  (1) common meaning of whey protein concentrate mandated a 25% minimum protein content level; and (2) Plaintiff's documents were not in proper form at the time of presentation and, thus, quota priority and status did not attach prior to quota's closure and merchandise was properly classified under the "basket" HTSUS subheading 0404.10.15 for modified whey.

[Plaintiff's motion for summary judgment denied; Defendant's cross-motion for summary judgment granted.]

*Sonnenberg & Anderson* (*Steven Sonnenberg, Esq.*), for Plaintiff.

*Stuart E. Shiffer*, Acting Assistant Attorney General of the United States; *Joseph I. Liebman*, Attorney in Charge, International Trade Field Office, Civil Division, United States Department of Justice, Commercial Litigation Branch; of counsel: Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs Service (*Yelena Slepak*), for

Defendant.

Decided:  August 10, 2001

**MEMORANDUM OPINION**

**EATON, JUDGE:**  This matter is before the Court on cross-motions for summary judgment and involves a classification dispute in which Plaintiff challenges the United States Customs Service's ("Customs") denial of its protests filed in accordance with section 514 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1514 (1994).  The Court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (1994).  At issue is the proper classification under the Harmonized Tariff Schedule of the United States ("HTSUS") (1997), 19 U.S.C. § 1202 (1994), of Plaintiff's entries of its modified whey product "Esprion 250," used in making baked goods, ice cream, infant foods, and dietetic products.  (Pl.'s Mem. Supp. Summ. J. at 2–3 ("Pl.'s Mem.").)  At liquidation Customs classified the subject merchandise under HTSUS subheading 0404.10.15, which is the "other," or "basket," subheading for modified whey products.

Plaintiff's principal argument is that Esprion 250 is a concentrated form of whey and, as the HTSUS does not specify a minimum protein content level for "whey protein concentrate," it is properly classified under subheading 0404.10.05 as such.  (See Pl.'s Mem. at 4.)  The United States ("Government"), on behalf of Customs, contends that, since the subject merchandise does not contain at least 25% protein, it does not fit within the common meaning of the term "whey protein concentrate" under subheading 0404.10.05.  (See Def.'s Mem. Opp'n to Pl.'s Mot. Summ. J. at 2 ("Def.'s Opp'n").)

Plaintiff's second argument is that, in the event Customs' classification is upheld by the Court, some of the subject merchandise should be accorded quota class[1] tariff-rate treatment[2] under HTSUS subheading 0404.10.11,[3] since it was properly entered prior to the September 3, 1997, closing of the quota covering "other" modified whey. (Pl.'s Mem. at 22–23.) As to this argument, the Government contends that Customs properly classified Esprion 250 in the "other," or "basket," subheading of HTSUS 0404.10.15, because the documentation presented at the time of entry was not "in proper form" and, therefore, Plaintiff's merchandise was not entitled to quota-class "priority and status." (Def.'s Mem. at 15–16.)

## STANDARD OF REVIEW

Where jurisdiction is predicated on 28 U.S.C. § 1581(a), Customs' classification is subject to de novo review pursuant to 28 U.S.C. § 2640 (1994). Franklin v. United States, 25 CIT __, __, 135 F. Supp. 2d 1336, 1338 (2001). The court employs a two-step process when

---

[1]     "Quota-class merchandise" is "any imported merchandise subject to limitations under an absolute or a tariff-rate quota." 19 C.F.R. § 132.1(e) (1997).

[2]     "Tariff-rate quotas" allow "a specified quantity of merchandise to be entered or withdrawn for consumption at a reduced duty rate during a specified period." 19 C.F.R. § 132.1(b). Once the applicable quota quantity is reached, "[m]erchandise imported in excess of the quantity admissible at the reduced quota rate . . . is permitted entry at the higher duty rate." 19 C.F.R. § 132.5(b) (1997).

[3]     Plaintiff's entry summary documents identified the subject merchandise as "whey protein concentrate" pursuant to HTSUS subheading 0404.10.05. However, after the quota closed, a representative sample of the subject merchandise was submitted for laboratory testing. (See Def.'s Mem. Ex. A; Pl.'s Mem. Ex. D.) The laboratory concluded that the sample constituted "a modified whey of the reduced minerals type . . . and not whey protein concentrate." (Id.) At liquidation, Customs classified all entries of Esprion 250, including those identified by Plaintiff as "whey protein concentrate" and entered prior to the quota's closure, under HTSUS subheading 0404.10.15 as "Modified whey . . . Other . . . Other." (Def.'s Mem. Appx. A.)

analyzing a Customs classification issue: "first, construe the relevant classification headings; and second, determine under which of the properly construed tariff terms the merchandise at issue falls." Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998) (citing Universal Elecs., Inc. v. United States, 112 F.3d 488, 491 (Fed. Cir. 1997)). The first step in this process is a question of law. Bausch & Lomb, 148 F.3d at 1365. The second step is one of fact. Id.

Summary judgment of a classification issue "is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is." Id. (citing Nissho Iwai Am. Corp. v. United States, 143 F.3d 1470, 1472 (Fed. Cir. 1998)).[4] Here, there is no genuine issue as to any material fact, as the parties agree that the subject merchandise, Esprion 250, is a modified whey[5] powder containing less than 25% whey protein.[6]

---

[4]    "Understood in that manner, there is nothing inherently incompatible with the summary judgment process if the court construes the relevant (competing) classification headings, a question of law; determines what the merchandise at issue is, a question of fact; and then, if there is no genuine dispute over the nature of the merchandise, adjudges on summary judgment the proper classification under which it falls, the ultimate question in every classification case and one that has always been treated as a question of law." Bausch & Lomb, 148 F.3d at 1365–66.

[5]    The HTSUS subheading "Modified whey" encompasses whey products "consisting of whey constituents, i.e., whey from which all or part of the lactose, proteins or minerals have been removed, whey to which natural whey constituents have been added, and products obtained by mixing natural whey constituents." HTSUS Chapter 4, Subheading Note 1. Both parties agree that Esprion 250 is a type of modified whey. (See Pl.'s Mem. Ex. A; Def.'s Mem. Ex. B1 (describing, in Plaintiff's product literature, subject merchandise as being 50% demineralized).)

[6]    Plaintiff contends that Esprion 250 contains a protein content level of "approximately 12% to 13.1%." (Pl.'s Statement of Material Facts as to Which there Is No Genuine Issue at ¶ 16.) The Government contends that Esprion 250 contains a protein content level of 12%. (Def.'s Statement of Undisputed Facts at ¶ 4.) In any case, both parties agree that

## DISCUSSION

The proper classification of merchandise under the HTSUS is governed by the General Rules of Interpretation ("GRI") and the Additional United States Rules of Interpretation. See Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citing Baxter Healthcare Corp. v. United States, 182 F.3d 1333, 1337 (Fed. Cir. 1999). The GRI are applied in numerical order. Carl Zeiss, 195 F.3d at 1379 (Fed. Cir. 1999).

The GRI provide that, "[f]or legal purposes, classifications shall be determined according to the terms of the headings and any relative section or chapter notes . . . ." GRI 1. Here, the parties agree that Esprion 250 should be generally classified as "modified whey" under subheading 0404.10, but disagree as to the proper specific subheading. Thus, the Court moves to the next applicable rule of interpretation, GRI 6, which provides that, "[f]or legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, mutatis mutandis, to the [GRIs], on the understanding that only subheadings at the same level are comparable." GRI 6; see also Rollerblade, 24 CIT at __, 116 F. Supp. 2d 1247, 1251 (2000). In the event that merchandise is not found to be classifiable under a specific subheading, it is then classified as "other." The "other," or "basket," provision of a subheading should be used only if there is no tariff category that more specifically covers the merchandise. See Rollerblade, 24 CIT at __, 116 F. Supp. 2d at 1251 (citing EM Indus., Inc. v. United States, 22 CIT 156, 165, 999 F. Supp. 1473, 1480 (1998)); see also GRI 3(a) ("The heading which provides the most specific

---

Esprion 250 contains a protein content level of less than 25%.

description shall be preferred to headings providing a more general description.").

I.      **Whether Esprion 250 is Properly Classified as Whey Protein Concentrate**

The HTSUS provides specific classifications for whey and modified whey products.

Subheading 0404.10, which encompasses these products, is divided into several further

subheadings.  The relevant language is:

Subheading/Article Description

Modified whey:

| 0404.10.05. | Whey protein concentrates . . . |
| | Other: . . . |
| 0404.10.11. | Described in additional U.S. note 10 to this chapter and entered pursuant to its provisions . . .[7] |
| 0404.10.15. | Other . . . . |

HTSUS 0404.10.  Both parties agree that, since the term "whey protein concentrate" is not

defined in the chapter notes of Chapter 4 of the HTSUS, or in any other explanatory material, the

common and commercial meaning is determinative.  Thus, central to the resolution of this action

is the common meaning of "whey protein concentrate."

Plaintiff disputes Customs' assertion that merchandise must have a minimum 25%

---

[7]      Additional Note 10 provides:  "[t]he aggregate quantity of dairy products described in additional U.S. note 1 to chapter 4, entered under subheadings . . . [including] 0404.10.11 . . . in any calendar year shall not exceed 2,785,000 kilograms . . . ."  HTSUS Chapter 4, Additional U.S. Note 10.  Additional U.S. Note 1 provides:  "[f]or the purposes of this schedule, the term 'dairy products described in additional U.S. note 1 to chapter 4' means any of the following goods: . . . dried milk, whey or buttermilk (of the type provided for in subheadings 0402.10, 0402.21, 0403.90 or 0404.10) . . . ."  HTSUS Chapter 4, Additional U.S. Note 1.

protein content level for it to be classified as whey protein concentrate, by noting the absence of such a requirement in the text of the HTSUS. (Pl.'s Mem. at 4.) Plaintiff further argues that the Government's reliance on the Food and Drug Administration's ("FDA") definition of whey protein concentrate is misplaced because of the differing objectives of that agency and Customs. (Pl.'s Mem. at 15.) "While the FDA examines merchandise for public health and safety purposes, pursuant to 21 U.S.C. § 393, Customs examines merchandise for determination of duties and for compliance with Customs laws pursuant to 19 CFR § 151.1." Id. The Government, on the other hand, argues that the "term 'concentrate' is obviously a highly technical term" (Def.'s Mem. at 8) and, thus, reliance on its scientific meaning is required. Both parties argue that the Court should parse the phrase "whey protein concentrate" and examine each component word—in particular the word "concentrate." (Pl.'s Mem. at 8; Def.'s Opp'n at 3.) This seems unnecessary, however, since the term at issue is not the single word "concentrate," but the three word term "whey protein concentrate" which has a well-understood common and commercial meaning within the United States dairy industry and elsewhere.

If there is no Congressional intent to the contrary, HTSUS terms are understood to be consonant with their common and commercial meaning; and these meanings are presumed to be the same. Carl Zeiss, 195 F.3d at 1379 (citing Simod Am. Corp. v. United States, 872 F.2d 1572, 1576 (Fed. Cir. 1989)). The common and commercial meaning of a tariff term is a question of law for the court to decide. Goldhofer Trailers USA, Inc. v. United States, 7 CIT 141, 142 (1984) (citing Am. Express Co. v. United States, 39 C.C.P.A. 8, 10 (1951)). It is well-settled that, to determine the common meaning of a tariff term, "courts may and do consult dictionaries, scientific authorities, and other reliable sources of information . . . ." Nippon

Kogaku, 69 C.C.P.A. at 92–93, 673 F.2d at 382 (1982) (citing Trans-Atlantic Co. v. United

States, 60 C.C.P.A. 100, 102, 471 F.2d 1397, 1397 (1973); United States v. John B. Stetson Co.,

21 C.C.P.A. 3, 9 (1933)); Goldhofer Trailers USA, 7 CIT at 146 (citing United States v. C. J.

Tower & Sons, 48 C.C.P.A. 87, 89 (1961); Holly Stores, Inc. v. United States, 2 CIT 278, 285,

534 F. Supp. 818, 823 (1981), aff'd, 697 F.2d 1387 (Fed. Cir. 1982)).

A resort to these sources reveals that the term "whey protein concentrate" has a well-

understood meaning.  For example, the American Dairy Products Institute defines whey protein

concentrate as:

> the substance obtained by the removal of sufficient nonprotien constituents from
> pasturized whey so that the finished dry product contains not less than 25 percent
> protein.  Whey protein concentrate is produced by physical separation techniques
> such as precipitation, filtration, or dialysis.  As with whey, whey protein
> concentrate can be used as a fluid, concentrate, or dry product form.

American Dairy Products Institute, Whey & Whey Products, Definitions, Composition, Standard

Methods of Analysis 2 (2001) (citing 21 C.F.R. § 184.1979c(a) (1991).)  Likewise, a reference

manual on milk-derived products contains the following definition:

> Whey protein concentrates.  Whey protein concentrates . . . are products derived
> from whey by removal of minerals and lactose . . . . On a dry basis, the protein
> concentrate contains a minimum of 25% protein.

Ramesh Chandan, Dairy-Based Ingredients 33 (1997).

Actual practice within the United States dairy industry also reflects the requirement of a

minimum 25% protein content level for whey protein concentrate.  In addition to the American

Dairy Products Institute's definition, the United States Dairy Export Council provides a series of

definitions for the use of its members that reflect a continuum by which whey products are

identified. At one end of this continuum is "whey powder," which has a "Typical Composition"

of 11.0%–14.5% protein; next is "Reduced Lactose Whey," whose "Typical Composition" is

18.0%–24.0% protein; next are various degrees of "whey protein concentrate," whose protein

percentages are indicated by name, e.g., WPC-34, which contains 34% protein; finally, "Whey

Protein Isolate" whose "Typical Composition" of protein is in excess of 90%. (See generally

United States Dairy Export Council Reference Manual for U.S. Whey Products 25–30 (1999).

The definitions of whey protein concentrate, as formulated by the United States dairy

industry, are in accord with the longstanding definitions used by various government agencies,

including the FDA and the United States Department of Agriculture ("USDA").[8] While these

agency definitions are not binding on the Court, because they are in accord with other reliable

sources, they do provide support for the definitions found in those sources. Foodcomm Int'l v.

United States, 19 CIT 1421, 1427 (1995).

In disputing the Government's position that merchandise, in order to be classified as

whey protein concentrate, must have at least a 25% protein content level, Plaintiff cites "two

scientific authorities [that] explicitly state that no minimum standard [of protein] exists." (Pl.'s

Opp'n to Def.'s Mot. Summ. J., at 9 ("Pl.'s Opp'n").)

The first source Plaintiff cites is a thesis paper prepared by a graduate student in 1985.

Plaintiff relies on this thesis paper for the proposition that there "are no specifications for WPC

---

[8] See 21 C.F.R. § 184.1979c (1982) (FDA definition); 7 C.F.R. § 58.805 (1982) (USDA definition).

composition." (Pl.'s Mem. at 21 (citing Eva Mirjam Kaunstein, Production and Stability of Cream Liqueurs Made with Whey Protein Concentrate 21 (1985) (unpublished Ph.D. Thesis, University of Wisconsin-Madison).) However, Plaintiff has not accurately quoted this thesis paper which, in its full context, reads "[p]resently [i.e. in 1985] there are no specifications for WPC composition." Kaunstein at 21 (citing M. E. Matthews, Whey Protein Recovery Processes and Products, 67 J. of Dairy Sci. 2680, 2685 (1984)). Moreover, the underlying source for the thesis paper's alleged proposition that "no specifications for WPC composition" exist does nothing to further Plaintiff's argument. An examination of this source reveals that, rather than supporting Plaintiff's case, it tends to bolster that of the Government. When the sentence found convincing by Plaintiff is quoted in its entirety, it reads as follows:

> Although no official standards of identity have been established in the U.S., the United States Department of Agriculture (USDA) does recognize the following product descriptions: whey powders [having less than 25% protein] . . . and whey protein concentrate which must contain more that 25% protein . . . .

Matthews, 67 J. Dairy Sci. at 2685. Therefore, Plaintiff's own authority establishes that, since at least 1984, there has been a recognized standard that whey protein concentrate must have a minimum protein content level in excess of 25%.

Plaintiff next directs the Court's attention to a monograph by German scientists that it claims as "[a]dditional scientific authority" for its assertion that "[t]he wide variety of whey protein concentrate production techniques has 'led to the production of native, i.e. technologically functional whey protein concentrates with varying protein levels.'" (Pl.'s Opp'n at 3–4 (citing Tadeusz Sienkiewicz & Carl-Ludwig Riedel, Whey and Whey Utilization 164 (2d ed. 1990).) Again, it is difficult to see how this source supports Plaintiff's case. The monograph

makes reference to various standards for categorizing whey products in Europe and the United States. According to the monograph, "[t]he prerequisites for whey products presented in table 87 have been applicable in the U.S.A. since 1987." Sienkiewcz & Riedel, at 164. Table 87 indicates that "whey protein concentrate powder" must have a minimum protein content of 25%. Id. at 165. According to the monograph, since 1987 whey products containing less than 25% protein have been classified as various kinds of whey powders in the United States. Id.

Thus, it appears that Plaintiff is unable to cite any clear authority supporting its position, and the authority it does cite is either equivocal or supportive of the Government's position. Indeed, it is clear that the term "whey protein concentrate" has a common and commercial meaning requiring that such products contain not less than 25% whey protein. Applying this common meaning to Plaintiff's merchandise, Esprion 250 is not a "whey protein concentrate" within the meaning of HTSUS subheading 0404.10.05 and must, therefore, be classified under some other subheading covering modified whey.

## II.      Quota-Class Tariff Treatment

Because Esprion 250 is not whey protein concentrate within the meaning of HTSUS subheading 0404.10.05, the Court next examines whether, as argued by Plaintiff, the merchandise should be accorded quota-class tariff treatment and, thus, be classified under HTSUS subheading 0404.10.11.

In calendar year 1997, products described in Additional U.S. Note 10 to Chapter 4 of the HTSUS, which included "modified whey" products, were subject to a tariff-rate quota that

permitted 2,785,000 kilograms of merchandise to be entered at a reduced rate of duty. Before

this quota was filled, "other" modified whey products were classifiable under HTSUS

subheading 0404.10.11 and subject to a duty rate of 13% ad valorem. After the quota was filled,

imports of "other" modified whey products were classified under the "basket" subheading

0404.10.15 and subject to a rate of $1.126 plus 9.2% ad valorem. The quota that included

"other" modified whey products was filled on September 3, 1997. (Pl.'s Statement of Material

Facts as to Which there Is No Genuine Issue at ¶ 22; Def.'s Resp. to Pl.'s Statement of Material

Facts at ¶ 22.) Thus, any entries presented before the quota filled were entitled to quota-class

tariff treatment, and the benefits of the lower rate of duty.

Plaintiff contends that several of its entries are entitled to quota-class treatment because

they "were properly presented before the quota closed" on September 3, 1999. (Pl.'s Mem. at

23.) The Government argues that these entries are not entitled to quota-class treatment because

Plaintiff's "entry summaries were not presented to Customs in proper form because at entry, the

merchandise was incorrectly classified [by Plaintiff] and the proper estimated quota duties were

not attached." (Def.'s Mem. at 15.) Plaintiff counters that the requirement that entry summaries

be presented "in proper form" "refers to apparent accuracy of form, not to accuracy of

substance." (Pl.'s Mem. at 24.) Thus, the question presented the Court is the meaning of the

phrase "in proper form."

When merchandise is entered into the United States, documents are filed with Customs

for two purposes: (1) to determine whether the merchandise is admissible and may be released

from Customs' custody; and (2) so that Customs officials may "verify the value and

classification of the merchandise, assess duties, collect certain statistical information, and determine whether the requirements of various laws have been met." New York County Lawyers' Association, Handbook on Customs & International Trade Law (M. Barry Levy & Alan Goggins eds., 2d ed. 1999) at 1; see also 19 U.S.C. § 1484(a)(1)(B) (1994). These documents are referred to as the "entry summary." Handbook at 1; see also 19 C.F.R. § 141.0a(b) (1997). Generally, it is the duty of the "importer of record" or his authorized agent to file these documents. Handbook at 1; see also 19 U.S.C. § 1484(a)(1). The date on which "these papers are originally filed is the official date of entry." Handbook at 3; see generally, 19 C.F.R. § 141.68(a), (b) (1997).

In order to qualify for quota-class priority and status,[9] entry summaries must be presented in proper form to the appropriate Customs officer. See 19 C.F.R. § 132.1(d). While the phrase "in proper form" is not defined by statute or regulation, here it cannot have the meaning urged by Plaintiff. Where a document is presented to Customs under 19 C.F.R. § 132.1(d), "apparent accuracy and conformity with procedural filing requirements" (Pl.'s Mem. at 24) is simply not

---

[9]     Entered merchandise must be accorded a place in a quota-class both by quota "priority" and "status":

> (f) Quota priority. "Quota priority" is the precedence granted to one entry or withdrawal for consumption of quota-class merchandise over other entries or withdrawals of merchandise subject to the same quota.

> (g) Quota status. "Quota status" is the standing which entitles quota-class merchandise to admission under an absolute quota, or to a reduced rate of duty under a tariff-rate quota, or to any other quota benefit.

19 C.F.R. § 132.1(f), (g).

enough.

Customs' regulations provide guidance for determining whether entry documents have been presented in proper form. Specifically, "[q]uota priority and status are determined as of the time of presentation of the entry summary for consumption, or withdrawal for consumption, in proper form . . . ." 19 C.F.R. § 132.11(a) (1997). "Presentation" occurs when there is delivery to the appropriate Customs officer of "[a]n entry summary for consumption . . . with estimated duties attached . . . ." 19 C.F.R. § 132.1(d). An "entry summary" is "any other documentation necessary to enable customs to assess duties . . . and determine whether other requirements of law or regulation are met." 19 C.F.R. § 141.0a(b). The documentation presented must indicate the proper HTSUS subheading and tariff rate for the entered merchandise. 19 C.F.R. § 141.90(b) (1997). Moreover, Customs has stated that it bases its determination of whether merchandise is to be accorded quota-class priority and status upon the date and time an entry summary is presented in proper form. See Entry of Merchandise and Liquidation of Entries; Proposed Rule, 43 Fed. Reg. 55,774, 55,779 (Nov. 29, 1978) ("Customs needs the information presented in the entry summary documentation before releasing the merchandise because that information enables Customs to determine the quota priority and status.").

In deciding whether sufficient information has been provided to satisfy the requirement that documents be presented "in proper form" Fleshman v. West, 138 F.3d 1429 (Fed. Cir. 1998), is instructive. In Fleshman, the plaintiff appealed a Court of Veterans Appeals decision denying him disability benefits because he had timely submitted an incomplete application and then untimely filed a completed one. Id. at 1430–32. In affirming the lower court's decision, the

Court of Appeals for the Federal Circuit held that an application for disability benefits that

omitted the date, the applicant's signature and his address was not "in the form prescribed by the

Secretary," id. at 1430, since an incomplete application might not contain "an element of the

application . . . reasonably regarded as necessary to enable the agency to process the claim." Id.

at 1432; cf. United States v. Tsai, 9 Ct. Cust. App. 42, 44 (1919) ("To say that there has been a

substantial compliance would indicate that much of what is contained in the required certificate

is meaningless. [However, the certificate as presented here] affords no information to the officers

of customs as a basis for an investigation."). As a result of the applicant's failure to file the

application "in the form prescribed," the Federal Circuit held that the applicant did not gain the

benefit of his initial filing date. Fleshman, at 1432–33 ("Because Mr. Fleshman's original claim

form lacked a critical component . . . and . . . because [he] failed to return the [properly]

completed form within one year . . . [he] is not entitled to an effective date earlier than . . . the

[later] date [at which] he submitted his [properly completed] formal claim.").


        Where, as here, the entry summary forms the basis for determining whether the

merchandise is entitled to quota-class treatment, more than the "apparent accuracy" urged by

Plaintiff is required. As noted, the entry summary must "enable Customs to assess . . .

whether . . . requirements of law or regulation are met." 19 C.F.R. § 141.0a(b). In the case at bar

Plaintiff's documentation omitted several critical components which, if included, would have

provided a basis for Customs to ascertain whether the merchandise was entitled to quota-class

priority and status. Plaintiff's documents were not in proper form because: (1) they did not

classify the merchandise under a subheading eligible for quota-class priority and status; (2) they

did not claim the appropriate rate of duty for quota-class merchandise; and (3) they did not have

the proper estimated duties attached.  (Def.'s Mem. at 17.)  In fact, by presenting documents that

indicated, in effect, that its merchandise was not entitled to quota-class treatment, Plaintiff tacitly

declared that it was not seeking quota-class treatment.[10]

_____

[10]        Plaintiff argues that the "[l]egislative history of the Customs Modernization Act
and judicial decisions interpreting proper filing of income tax forms confirm that 'proper form' is
limited to matters of form, not substance." (Pl.'s Mem. at 26.)  In support of this argument
Plaintiff cites a regulation and case law.  The regulation provides:

> Entry and entry summary documentation shall be reviewed before
> acceptance to ensure that all entry and statistical requirements are
> complied with and that the indicated values and rates of duty
> appear to be correct. If any errors are found, the entry and the entry
> summary documentation shall not be considered to have been filed
> in proper form and shall be returned to the importer for correction.

19 C.F.R. § 141.64 (1997).

        As a preliminary matter, the Court notes that the quoted passage is found in a section of
the Code of Federal Regulations that generally addresses the filing of entry documents and entry
summaries.  Customs has promulgated a separate set of regulations specifically covering filings
related to quota-class merchandise which do not employ the above-quoted language.  In any
event, Plaintiff argues that, because the regulation states that documents must "appear to be
correct," this indicates that "apparent accuracy" is sufficient for documents to be in proper form.
However, the regulation is also clear that, "if any errors are found," the document "shall not be
considered to have been filed in proper form . . . ."  In other words, it is actual and not facial
accuracy that ultimately determines, under the cited regulation, whether a document has been
filed in proper form.  Here, Plaintiff's documents contain several actual errors and, thus, were not
in proper form.

        Plaintiff also attempts to support its position with case law analyzing the proper filing of
tax returns.  (See Pl.'s Mem. at 26 (citing United States v. Hindenlang (In re Hindenlang), 164
F.3d 1029, 1033 (6th Cir. 1999) ("[P]erfect accuracy or completeness is not necessary to rescue a
return from nullity, if it purports to be a return, is sworn to as such, and evinces an honest and
genuine endeavor to satisfy the law.")).)  In Hindenlang, the court addressed the issue of whether
documents submitted by a plaintiff contained sufficient information to qualify as a tax "return."
Because the Internal Revenue Service regulations did not specify the information needed in order
for a document to qualify as a "return," the court used the following test:

> In order for a document to qualify as a return: "(1) it must purport
> to be a return; (2) it must be executed under penalty of perjury; (3)
> it must contain sufficient data to allow calculation of tax; and (4) it

By thus omitting "critical components" "reasonably regarded as necessary,"

Fleshman,138 F.3d at 1432, for Customs to determine whether its merchandise was entitled to

quota-class priority and status, Plaintiff failed to satisfy the requirement that documents be

submitted in proper form.  Nor are Plaintiff's omissions harmless, for were Plaintiff now to get

the benefits of quota-class treatment for its merchandise it would, as the Government points out,

"result in circumvention of the . . . quota" because a greater amount of merchandise would be

subject to a lower duty than the quota would otherwise allow.  (Def.'s Mem. at 17.)  While

Plaintiff's entry summary might have been sufficient solely for purposes of classification, it was

not in proper form for purposes of gaining the benefit of quota-class priority and status.


Therefore, since Plaintiff's documents were not filed in proper form, quota priority and

status did not attach to the subject merchandise before the closing of the tariff-rate quota for

"other" modified whey under HTSUS subheading 0404.10.11.


**CONCLUSION**

Because Esprion 250 is not "whey protein concentrate" within the meaning of HTSUS

subheading 0404.10.05, and because Plaintiff did not fulfill its obligation to present its entry

documentation to Customs "in proper form," the Court finds that Customs properly classified the

---

must represent an honest and reasonable attempt to satisfy the
requirements of the tax law."

Hindenlang, 164 F.3d at 1033 (citing Beard v. Commissioner, 82 T.C. 766 (1984), aff'd, 793
F.2d 139 (6th Cir. 1986)).  Applying this test by analogy to the facts of this case, Plaintiff's
argument fails.  While it may be that entry documents do not have to be perfectly completed in
order to be in proper form, they "must at least contain sufficient data" to allow the agency to
make its necessary determinations.

subject merchandise under the "basket" HTSUS subheading of 0404.10.15 as "Whey and modified whey . . . Modified whey . . . Other . . . Other." The Court therefore denies Plaintiff's motion for summary judgment, and grants the Government's cross-motion. Judgment is entered accordingly.

_____

Richard K. Eaton

Date: August 10, 2001
      New York, NY